## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANDREW BAER, Individually and as Trustee of the ANDREW J. BAER TRUST; MICHAEL ROSENBLOOM, Individually and as Trustee with ROBYN ROSENBLOOM of the MICHAEL ROSENBLOOM REVOCABLE TRUST; WING POINT INVESTMENTS LLC; EYTAN TURJEMAN; NAAMITH HEIBLUM; MORDEHAI HEIBLUM; RACHEL HEIBLUM; YEHUDITH HEIBLUM; ZOHAR HEIBLUM; REUVEN HEIBLUM; GREG ISAACS; BERNARD E. FRANCOIS, as Trustee of the BERNARD E. FRANCOIS LIVING TRUST; SETH ROSENBERG; DEBORAH LOUGHMAN; JOHN MILLER, Individually and as Trustee of the MILLER TRUST; and SIERRA SPRINGS DIVERSIFIED INCOME FUND, LP; Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>DUFF & PHELPS, LLC,<br><br>Defendant. | CASE NO:<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Andrew Baer, individually and as trustee of the Andrew J. Baer Trust; Michael Rosenbloom, individually and as trustee with Robyn Rosenbloom of the Michael Rosenbloom Revocable Trust; Wing Point Investments LLC; Eytan Turjeman; Naamith Heiblum; Mordehai Heiblum; Rachel Heiblum; Yehudith (Judy) Heiblum; Zohar Heiblum; Reuven Heiblum; Greg Isaacs; Bernard E. Francois, as trustee of the Bernard E. Francois Living Trust; Seth Rosenberg; Deborah Loughman; John Miller, Individually and as Trustee of the Miller Trust; and, Sierra Springs Diversified Income Fund, LP ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through Plaintiffs' undersigned counsel, allege the following upon

information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon

personal knowledge.  Plaintiffs information and belief is based upon, among other things, their

counsel's investigation, which includes, without limitation, review and analysis of:  (i) documents

made available to investors in the Direct Lending Income Fund, L.P. (the "Domestic Fund") and

Direct Lending Income Feeder Fund, Ltd. ("Offshore Fund," and together with the Domestic Fund,

the "Funds" or "Partnership"); (ii) the action filed in the United States District Court for the Central

District of California by the United States Securities and Exchange Commission ("SEC") against

Direct Lending Investments, LLC ("DLI" or the "General Partner");[1] (iii) the action filed in the

United States District Court for the Central District of California by the Receiver (defined below)

against Duff & Phelps, LLC ("Duff & Phelps" or "Defendant") alleging, *inter alia*, negligence and

breach of contract;[2] and (iv) other publicly available information concerning DLI and the Funds.

## NATURE AND SUMMARY OF THE ACTION

1.      Plaintiffs, and members of the putative class, are investors and limited partners

("Limited Partners") in two feeder funds, the Domestic Fund and the Offshore Fund, whose assets

were invested in the "Master Fund" known as DLI Capital, Inc. ("DLI Capital" or the "Master

Fund").[3]  The Funds and the Master Fund were created and managed by DLI and its principal

Brendan Ross ("Ross").  The Master Fund invested in, or made loans, to various businesses or

third-party borrowers who were primarily lenders which made loans or extensions of credit to

others.

---

[1] *SEC v. Direct Lending Investments LLC*, Case No. 2:19-cv-02188-DSF-MRW (C.D. Cal.) (Fischer, J.), filed on March 22, 2019 (the "*SEC* Action").

[2] *Bradley D. Sharp, as the Permanent Receiver for the Estate of Direct Lending Investments, LLC, et al. v. Duff & Phelps, LLC*, Case No. 2:20-cv-08069 (C.D. Cal.) (Fischer, J.), filed September 3, 2020 (the "Receiver D&P Complaint") (dismissed on forum non conveniens grounds on Jan. 28, 2021).

[3] The Domestic Fund is larger than the Offshore Fund, representing approximately 76% of the total Funds as of November 30, 2018.  The Master Fund also included certain other entities and subsidiaries, including DLI Capital Partner, Inc., DLI Assets Bravo, LLC and DLI Assets, LLC, through which investments were made.

2.     On or around October 26, 2016, DLI retained Duff & Phelps to provide fair value opinions as to value of the Master Fund investment portfolio, which at that time held loan investments from 16 separate loan issuing platforms.  Duff & Phelps provided quarterly valuation reports for the period ending September 30, 2016 through the period ending September 30, 2018.  Then, beginning in October 2018, Duff & Phelps began to provide monthly valuation reports.

3.     DLI and Ross provided the Limited Partners with monthly letters (the "Investor Letters"), which during Duff & Phelps's initial engagement, explained to the Limited Partners that Defendant was "provid[ing] quarterly valuation ranges for the fund's assets.  Using their ***independently formulated***[4] valuation range at the portfolio level[.]"  February 2017 Investor Letter.  With the provision of monthly valuation reports in October 2018, the Limited Partners were again informed that Duff & Phelps would be providing "independent, third-party valuation reporting" (October 2018 Investor Letter) and subsequent Investor Letters included confirmations of valuation or "performance net returns" by Duff & Phelps.  For example, in the December 2018 Investor Letter, Ross also told investors that the Funds had received "our third-party valuation reporting for November, and we were able to confirm that the previous estimate of 0.77% for the month ending November 30, 2018, is the final net performance for that month."

4.     Because of the due diligence DLI's investors performed prior to and during investing, and more importantly the fact that investors could not independently ascertain the value of the Funds' assets, third-party independent valuations were central to DLI's scheme.  Duff & Phelps's valuations confirmed year after year that the Funds' non-marketable "Level 3" assets were accurately and fairly valued.  Without the independent valuations, DLI would not have

---

[4] Unless otherwise noted, all emphasis is added.

collected and retained the millions of dollars in investments from investors and millions of dollars in management and performance fees.

5.      In truth, Duff & Phelps was not performing "independent" valuation reporting. Instead, Duff & Phelps knowingly abrogated its independent and professional duties, aiding and abetting Ross and certain other parties in committing a fraud upon the Plaintiffs, among other things.  Duff & Phelps was aware that DLI touted the "independent" cross-check Duff & Phelps was purportedly performing, but merely complied with Ross's demands, turning a blind eye to numerous red flags and failing to perform basic valuation procedures, including those identified in its engagement agreement with DLI.

6.      On April 1, 2019, the court in the *SEC* Action appointed a permanent receiver over DLI, Bradley D. Sharp, (the "Receiver").

7.      On November 13, 2020, the Receiver issued a detailed report regarding his investigation (the "Receiver's Report") wherein it is stated, *inter alia*, that:  (i) investors will suffer cash losses total $250.7 million as of March 31, 2019 based on the shortfall between the amount of net invested capital and the estimated future distributions to investors; (ii) there was an aggregate underreported allowance for doubtful accounts and bad debt expense of $501.4 million relative to the obligations of loan counterparties as of March 31, 2019; (iii) of the $1.7 billion in funding for loans to counterparties, only $465.2 million has been repaid in full, with interest, as of July 31, 2020; (iv) the accounting records and account statements delivered to investors did not reflect appropriate reserves for uncollectable assets and included inflated "mark-ups" relative to appropriate asset valuations, both of which resulted in a misrepresentation of income, value of assets and net worth as well as overstated net asset values ("NAVs"); (v) that as of November 2019, the Funds' NAV was materially overstated by $465.7 million; (vi) the Funds were in essence

a Ponzi scheme perpetrated by Ross and several others; and, (vii) that "third party professional service advisors and individuals were substantial factors contributing to, or directly, causing losses" to the Funds.  *SEC* Action ECF No. 320.

8.      As alleged herein, between at least 2016 and January 2019, Defendant:  (i) aided and abetted the fraud described herein perpetrated on Plaintiffs, intentionally overvaluing the Funds; (ii) aided and abetted in breaches of fiduciary duties owed to Plaintiffs by Ross, DLI, and others; (iii) negligently misrepresented the due diligence performed on DLI's investments, the material risks, and true value of the investments (and aided and abetted in the like negligent misrepresentations of Ross and others).

9.      Plaintiffs relied on Duff & Phelps's independent valuations for assurance that DLI's assets were fairly valued.  Through the purportedly independent valuation confirmations, Duff & Phelps knowingly, recklessly, and/or negligently provided substantial assistance in the massive Ponzi scheme, causing substantial damages to Plaintiffs and the Class.  Had Plaintiffs known the truth, they would not have invested, made additional investments, or maintained their investments in the Funds.

## **JURISDICTION AND VENUE**

10.      This Court has jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one member of the putative class is a citizen of a State different from the defendant.

11.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Duff & Phelps is headquartered in and resides in this District.

## PARTIES

**A.     Plaintiffs**

12.     Plaintiff Andrew J. Baer Trust is a Maryland revocable trust formed on December 20, 2017.  Plaintiff Andrew J. Baer ("Baer") is the sole trustee of the Andrew J. Baer Trust.  During the relevant period, Baer, individually and as trustee of the Andrew J. Baer Trust, was a Limited Partner in the Domestic Fund.

13.     Plaintiff Michael Rosenbloom Revocable Trust (the "Rosenbloom Trust") is a Florida revocable trust formed on May 23, 2000.  Plaintiffs Michael Rosenbloom ("Rosenbloom") and Robyn Rosenbloom are the trustees for the Rosenbloom Trust.  During the relevant period, Rosenbloom, individually through his Roth IRA, and as trustee of the Rosenbloom Trust, was a Limited Partner in the Domestic Fund.

14.     Plaintiff Wing Point Investments LLC is a Washington limited liability company. John Bierly is the President and Manager of Wing Point Investments LLC.  During the relevant period, Wing Point Investments LLC was a Limited Partner in the Domestic Fund.

15.     Plaintiffs Eytan Turjeman and Naamith Heiblum, husband and wife, (together, the "Turjemans") are individuals residing in Eugene, Oregon.  During the relevant period, the Turjemans were Limited Partners in the Domestic Fund.

16.     Plaintiffs Mordehai and Rachel Heiblum (the "Heiblums"), husband and wife, reside in Rehovot, Israel.  During the relevant period, the Heiblums, individually and through an IRA, were Limited Partners in the Domestic Fund.

17.     Plaintiff Yehudith (Judy) Heiblum ("Y. Heiblum") is an individual residing in Rehovot, Israel.  During the relevant period, Y. Heiblum was a Limited Partner in the Domestic Fund.

18.     Plaintiff Zohar Heiblum ("Z. Heiblum") is an individual residing in Savyon, Israel. During the relevant period, Z. Heiblum was a Limited Partner in the Domestic Fund.

19.     Plaintiff Reuven Heiblum ("R. Heiblum") is an individual residing in Rehovot, Israel.  During the relevant period, R. Heiblum was a Limited Partner in the Domestic Fund.

20.     Plaintiff Greg Isaacs ("Isaacs") is an individual residing in Sherman Oaks, California.  During the relevant period, Isaacs was a Limited Partner in the Domestic Fund.

21.     Plaintiff Bernard E. Francois ("Francois"), a resident of Arizona, is sole trustee of the Bernard E. Francois Living Trust (the "Francois Trust") formed on April 15, 2002.  During the relevant period, the Francois Trust was a Limited Partner in the Domestic Fund.

22.     Plaintiffs Seth Rosenberg ("Rosenberg") and Deborah Loughman ("Loughman"), husband and wife, are individuals residing in Downers Grove, Illinois.  During the relevant period, Rosenberg and Loughman, individually and through an IRA, were Limited Partners in the Domestic Fund.

23.     Plaintiff John Miller ("Miller") is an individual residing in Corte Madera, California.  Miller and Diana Miller are trustees of the Miller Trust formed on August 15, 2001.  During the relevant period, Miller, individually, through an IRA, and as trustee of the Miller Trust, was a Limited Partner in the Domestic Fund.

24.     Plaintiff Sierra Springs Diversified Income Fund, LP ("Sierra Springs") is a Maryland limited partnership.  Douglas Zinke ("Zinke"), an individual residing in Ashton, Maryland, is the Manager and General Partner of Sierra Springs.  During the relevant period, Sierra Springs was a Limited Partner in the Domestic Fund.

25.     Plaintiffs bring these claims as Limited Partners in the Fund, individually and on behalf of the Class.  Plaintiffs and Class members were induced by Duff & Phelps's "independent"

valuations of the Funds to invest in and continue to hold their investments in the Funds to the exclusion of other investment opportunities and relied on Duff & Phelps's purportedly independent "cross-checks" in making these decisions.

26.     In addition to out-of-pocket losses and lost profits from foregoing other investment opportunities, each plaintiff and Class member paid excess performance and management fees from 2016 through 2019 based on the overstated asset valuations that Duff & Phelps corroborated. Each plaintiff and Class member also sustained damages related to the payment of taxes on illusory income. Because the Funds are "pass through" entities with no independently taxable income, the profits and losses of the Funds are allocated to the Limited Partners in accordance with each Limited Partner's distributive share. Each individual Limited Partner pays taxes on the profits allocated to his or her capital account and may offset other taxable income with losses allocated to the capital accounts.

**B.     Defendant**

27.     Defendant Duff & Phelps is a Delaware limited liability company headquartered in New York, New York with offices throughout the United States. Duff & Phelps is a global advisory firm focusing on valuations, corporate finance, investigations, disputes, cyber security, compliance and regulatory matters, and other governance-related issues.

**C.     Other Relevant Parties**

28.     DLI was the General Partner and Investment Manager of the Funds. DLI is organized under the laws of the state of California and maintains its principal place of business at the same location as the Domestic Fund, at 550 North Brand Boulevard, 20th Floor, Glendale, California, 91203. DLI managed the Funds and their investments and was a registered investment advisor with the SEC.

29.    The Domestic Fund is a Delaware limited partnership organized in or around September 2012, operating as an investment vehicle as of November 2012.  The Domestic Fund, through the General Partner, solicited capital from investors who are the Limited Partners of the Domestic Fund.  In or around October 2016, the Domestic Fund became a feeder fund for the Master Fund, no longer holding assets or capital.

30.    The Offshore Fund is a Cayman Islands exempted company formed in late 2016. The Offshore Fund was a feeder fund for the Master Fund.

31.    DLI Capital is a Nevada corporation formed in late 2016 which, together with various wholly owned subsidiaries, performed the actual lending and investing activities that generated the Funds' returns.

32.    Ross founded DLI in September 2012 and served as DLI's Chief Executive Officer ("CEO") from 2012 until March 2019.  Ross held various positions at DLI, including Portfolio Manager, and served on the Offshore Fund's board of directors.  Ross exercised control over DLI and is referred to in the Funds' Private Placement Memoranda[5] as the "Principal."  On August 11, 2020, Ross was arrested following a grand jury indictment on ten counts of wire fraud.[6]  On August 11, 2020, the SEC filed a civil complaint in this Court alleging that Ross defrauded investors of DLI, and seeking disgorgement of all funds received from his illegal conduct and civil penalties.[7]

33.    VoIP Guardian Partners I, LLC ("VoIP") is a Delaware limited liability company formed in September 2015 with its original principal place of business in New York, New York. VoIP was most recently located in Santa Monica, California.  VoIP Guardian, LLC is the sole

---

[5] Numerous Private Placement Memoranda were issued throughout the relevant period.  Although references herein are to the Domestic Fund PPM dated December 2015 (the "2015 PPM"), and the Domestic Fund PPM dated September 2018 (the "2018 PPM"), upon information and belief all of the PPMs issued during the relevant period contain substantially similar language and are referred to herein (collectively, the "Private Placement Memorandum" or "Private Placement Memoranda" or "PPM").
[6] *United States of America v. Brendan Ross, aka "Brandon Rosen,"* Case No. 2:20-cr-00327-CSF (C.D. Cal.).
[7] *Securities and Exchange Commission v. Brendan Matthew Ross*, Case No. 2:20-cv-07202 (C.D. Cal.).

member of VoIP.  The sole manager of VoIP's board of managers is Omanoff America, LLC.  Rodney Omanoff ("Omanoff") is the sole manager of the board of managers at Omanoff America, LLC.  VoIP was one of the Funds' investments with a principal outstanding balance owed of $192 million from VoIP as of November 30, 2018.  VoIP filed a voluntary petition for bankruptcy on March 11, 2019.

34.     QuarterSpot, Inc. ("QuarterSpot") is incorporated in the state of Delaware with its principal place of business in New York, New York.  At all relevant times, QuarterSpot was licensed as a California Finance Lender, holding License Number 603K646 from the California Department of Business Oversight.  QuarterSpot was one of the Funds' investments and the subject of the *SEC* Action complaint.  *SEC* Action ECF No. 1.

## RELEVANT PROCEDURAL BACKGROUND

35.     Plaintiffs first filed this class action against Defendant on February 10, 2021 in the U.S. District Court for the Central District of California (Case No. 2:21-cv-01239).  On December 20, 2021, the court in that action granted Duff &Phelps's motion to dismiss for lack of personal jurisdiction "without prejudice to filing in the appropriate forum."

## SUBSTANTIVE ALLEGATIONS

### A.    Background and Structure of The Funds

36.     Ross founded DLI in September 2012.  The Domestic Fund was organized as a Delaware limited partnership at or around the same time.  The Domestic Fund solicited investors through the means of the Private Placement Memorandum, which included the Limited Partnership Agreement ("LPA").  Investors in the Domestic Fund are Limited Partners.  In order to become a Limited Partner, the investor received, completed, and returned a Subscription Agreement.  From at least 2015 to 2018, the minimum initial investment required was $250,000.  At all times, DLI served as the General Partner and Investment Manager of the Funds.

37.    In late 2016, the fund structure was changed to a feeder fund structure.  At that time, the Domestic Fund became a pass-through entity, giving the Limited Partners' capital contributions to the Master Fund for investment, again managed by DLI.  The Offshore Fund was also created, allowing for offshore investors to contribute to the Master Fund.  Under this structure, the Funds invested "all of their assets in a combination of loans to and equity in the Master Fund" which "generally issue[d] shares of common stock to the [Funds] in proportion to their investments in the Master Fund at the time of each investment by an investor in the [Funds]."  2018 PPM at 15.  The Master Fund in turn invested directly or indirectly in Collateral Assets, investments "in entities holding or originating short-term loans, lines of credit, receivables, real estate loans, portfolios of loans, intellectual property interests, real estate assets, consumer loans and other tangible and intangible assets, across a variety of industries."  2018 PPM at 2.

38.    The structure of the Fund Entities[8] at the time of the receivership is illustrated as follows:

---

[8]  As stated in the 2018 PPM, "Fund Entities" includes the Funds, the Master Fund, and the Master Fund's direct wholly owned subsidiaries.



39.     Along with the feeder fund structure change, DLI became a registered investment

adviser with the SEC under the Investment Advisers Act of 1940.

40.     The Funds' investments were generally loans to various business and retail lenders.

Prior to the feeder fund structure, the Domestic Fund primarily bought small business whole loans

with a purported objective to net an annualized 10% to 14% return for investors.  With the structure

change, DLI moved away from purchasing whole loans to "setting up financing structures with

lenders that pay a fixed return to the fund and for which a lender's individual loans serve as

collateral assets."  October 2016 Investor Letter.

41.     As of the 2018 PPM, the Partnerships' primary investment strategy was claimed to

be as follows:

> to make Investments (through its investment in the Master Fund, described below)
> in entities holding or originating short-term loans, lines of credit, receivables, real

estate loans, portfolios of loans, intellectual property interests, real estate assets, consumer loans and other tangible and intangible assets, across a variety of industries (such underlying assets, the "Collateral Assets"). Typical investments include, but are not limited to, $50-200 million asset-backed credit facilities to a diverse group of specialty finance companies, special purpose vehicles and other counterparties (collectively the "Counterparties", and each a "Counterparty") across the small business, consumer, receivables, real estate and other sectors.

2018 PPM at 2.

42.    As General Partner and investment advisor to the Funds, DLI monitored "the risks of the individual Investments and Counterparties of the Master Fund's portfolio in aggregate." 2018 PPM at 6.  As stated in the Private Placement Memorandum:

The primary goal of this process with respect to individual Investments is to ensure that they are performing as expected, and are adhering in all material respects to their stated policies and procedures and the Investment documentation.  In so doing the General Partner hopes to gain early insight into factors that might call for an increase or decrease in the allocation among such Investments.  In this process, the General Partner relies on software tools and analytical procedures, consultants, legal counsel and third party servicers, industry research, and, among other things, information from and periodic interactions with the personnel of the relevant Counterparties.  Additionally, third-party valuations of the Collateral Assets may be obtained or provided by the Counterparty or its affiliates in connection with the General Partner's review process.

2018 PPM at 6-7; 2015 PPM at 10 (similar).

43.    The majority of these "collateral assets" were Level 3 assets, meaning they were illiquid and could not be valued through normal means such as market value.  The Private Placement Memorandum described "general guidelines" used in determining the value of the Master Fund's Investments as follows:

- In regard to Credit Investments, the General Partner will generally value Credit Investments at par when sufficient collateral coverage exists in the borrowing base.  If a Credit Investment becomes undercollateralized, the Counterparty has an opportunity to cure the undercollateralization.  Taking into account any actions taken by a Counterparty to cure any such undercollateralization, the Valuation Committee will determine if an adjustment to the valuation of the Credit Investment is necessary.

- The General Partner will value Investments and Collateral Assets at par when they are performing in line with their contractual terms. Investments and Collateral Assets that have exhibited non-payment or noncompliance with their contractual terms will be re-assessed, in the General Partner's sole discretion, taking into account factors such as recent payment history, historical amortization payments and the historical performance of the Counterparty.

- For working capital lines and term loans the General Partner will assess the fair value based on an enterprise value analysis or an income approach method, which typically includes a discounted cash flow model with a discount rate that is calibrated to the yield of the debt at issuance. Other inputs used in the valuation may include interest coverage ratios, leverage ratios and other information obtained from the Counterparty, to assess changes to the credit profile of the Counterparty.

- When those Investments are comprised of Real Estate Investments, the General Partner includes the estimated recovery value of the underlying real estate collateral into its determination of fair value. Estimated recovery value takes into account the estimated fair value of the real estate collateral, the balance of any senior liens, foreclosure costs, and expected costs of liquidation.

2018 PPM at 58.

44.    In addition, the "General Partner's markets are assessed against an independent third party fair value report on a monthly basis, to support that the fair value determined using the valuation policy is within a reasonable fair value range." *Id.*

45.    The Partnerships' NAV was purportedly calculated "by adding the fair value of its investments, cash, and other assets and subtracting its liabilities in accordance with [generally accepted accounting principles] GAAP." *Id.*; 2015 PPM at 44 (similar). As more fully described in the 2015 PPM:

In general, Notes performing according to their original amortization schedule will be valued at the remaining principal balance plus accrued interest. Notes for which payments have deviated from their original amortization schedule will be re-valued, in the General Partner's sole discretion, taking into account the significance of the deviation and the historical performance of Notes with similarly situated borrowers.

Each Limited Partner's share of the Net Asset Value is determined by multiplying (i) the total value of the Partnership's investments and other assets less any actual

or accrued liabilities and expenses, by (ii) the Limited Partner's Allocation Percentage. A Limited Partner's "Allocation Percentage" shall mean with respect to any Limited Partner the quotient obtained by dividing (i) the value of its Capital Account balance for such Limited Partner as of the beginning of any Accounting Period by (ii) the Capital Account balance for the relevant period relative to the total value of all Limited Partners' Capital accounts at the beginning of such fiscal period.

The following general guidelines apply to the determination of the value of the Partnership's investments:

(1)   Net Asset Value will be calculated as provided above and include any credit or debit accruing to the Partnership but unpaid or not received by the Partnership;

(2)   Except with respect to Side Pocket Investments, interest earned on the Partnership's cash and investments, if any, will be accrued at least monthly;

(3)   The amount of any distribution declared by the Partnership, and of any withdrawal proceeds due but not yet payable, will be treated as a liability from the day when the distribution is declared, or the related withdrawal is effective, as applicable, until it is paid; and

(4)   Assets for which a market value is not readily available, which includes most or all Notes, are valued at amortized cost if the investment is performing according to its terms. If a Note is not performing according to its terms, the Note is revalued, taking into account the historical loss and recovery rate for Notes generated by the Lending Platform from which the Note was acquired.

The General Partner may deviate from its valuation policy on a case by case basis to value a Note at an amount greater or less than the amount indicated by the valuation policy based on the facts of each Note. The General Partner may change its valuation policy at any time based on the General Partner's subsequent analysis of the actual or expected performance of the Notes, and may have different valuation policies based upon the Partnership's historical experience with the Lending Platforms from which Notes are purchased.

2015 PPM at 44.

46.    Pursuant to the LPA, the General Partner received certain fees. According to the Private Placement Memorandum, the General Partner shall be paid "at the end of each calendar month, a performance fee . . . equal to twenty percent (20%) of the EBIT allocable to the Master Fund shares for the month." 2018 PPM at 24. Additionally, the General Partner was paid a

monthly investment management fee equal to 0.08333% (1% per annum) of the gross asset amount of the Master Fund. 2018 PPM at 25.

47.    Pursuant to the LPA, DLI had exclusive management and control of the Funds' business:

> Except as otherwise provided in this Agreement, the General Partner will have exclusive management and control of the business of the Partnership and will (except as otherwise provided in any other agreements) make all decisions affecting the Partnership and the Partnership's assets.

LPA, ¶ 5.02; 2015 PPM at 14; 2018 PPM at 14.

48.    The Limited Partners had no control over the affairs of the Funds and had no right to "select, vote for or remove the General Partner or its agents, or to otherwise participate in the business decisions of the Partnership." LPA, ¶ 6.02; 2015 LPA at 21; 2018 LPA at 19. Through investment management agreements, DLI also had exclusive control over the Funds' investment decisions. 2018 PPM at 12.

49.    DLI was controlled by Ross, who unbeknownst to investors, held ownership stakes in a number of the counterparties.

50.    In 2015, some of the investments had experienced significant losses, but at the same time, DLI dramatically increased its investments, rocketing from $100 million in assets at the end of 2014 to $800 million by the end of 2015. Along with the increased investments came increasingly high-risk investments and by early to mid-2017 many of DLI's investment platforms were in financial distress.

51.    As detailed in the Receiver's Report, a "pervasive fraud" and Ponzi scheme was orchestrated through the Funds by Ross. Ross and others, through DLI, fraudulently misrepresented the financial performance of the Funds' investments which the Receiver "believes . . . would have been prevented from continuing had certain third party professionals, and/or

others, alerted individuals to the true condition of the investment funds and the fraud and misconduct" being committed by Ross and certain of his cohorts.  Receiver Report at 6.  As described herein, Duff & Phelps's repeated superficial and grossly incorrect valuations of DLI's investments enabled Ross and others to continue increasing the investments, multiplying DLI's exposure to speculative and unsound investments.

52.    Plaintiffs and the Funds suffered net loan losses of $501.4 million "on account of the overstated nature of the loan portfolio and the generally high risk investments, many of which varied from the type and nature of the investments promised to investors" with aggregate investor cash losses of $250.7 million as of March 31, 2019.  *Id.* at 7.  Ross on the other hand benefited, directly or indirectly, from DLI payments totaling $31.4 million, and from $647 million in loans to counterparties in which Ross had or may have had a financial interest.  Similarly, Duff & Phelps benefitted with receipt of professional fees totaling $664,000 from 2016 through 2018, ignoring red flags and operating at the behest of Ross instead of independently, perpetuating the fraud upon Plaintiffs.

> **B.    The Funds' Purportedly Independent Valuation Advisor Failed To Perform Independent Valuations, Making Negligent Misrepresentations And Aiding In The Fraud Perpetuated On Investors**

53.    Sometime in 2016, Ross decided to expand DLI's investments and needed "true domestic institutional investors" to do so.  Receiver D&P Complaint, ¶ 37.  In order to make that happen, Ross began to see the need for a third-party valuation expert.  He was not pleased with having such a process performed, describing it as "annoying" and worrying that "if they were to find a material difference [from DLI's valuations, DLI would] be in a world of pain trying to restate."  Receiver D&P Complaint, ¶¶ 39-40.  Ross needed a "yes man" and identified Duff & Phelps for the job.  *Id.* at ¶ 41.

54.     Duff & Phelps signed its first engagement letter with DLI on October 26, 2016 (the "Engagement Letter").  The Engagement Letter provided that Duff & Phelps "in conjunction with [DLI's] preparation and timely completion of certain reporting requirements" would provide valuation services.  Receiver D&P Complaint, ¶ 45.

55.     Duff & Phelps was to apply its judgment, in consultation with DLI's management in generating its fair value estimates, including assessing the reasonableness of DLI's internal cash flow estimates, and inquiring as to any facts or circumstances deemed necessary for the analysis. Duff & Phelps was to also use information obtained from public, financial, and industry sources in performing its analyses.

56.     According to the Engagement Agreement, Duff & Phelps was to use the Accounting Standards Codification ("ASC") Section 820 (formerly Statement of Financial Accounting Standards No. 157, Fair Value Measurements) definition of "fair value" which is "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."  If Duff & Phelps had done so, Duff & Phelps's valuation reports would not have been in accord with DLI's as DLI's investments were significantly overvalued from "the price that would be received to sell" the assets in any form of "orderly transaction between market participants."

57.     Among the procedures Duff & Phelps was to undertake in order to complete its valuation were the following:  (i) meeting with DLI to discuss the valuation and related write-ups, to understand, among other things, DLI's underlying strategy and performance; (ii) consider general economic and industry trends and their impact on DLI's investments; (iii) consider certain other public information and information supplied by DLI relevant to Duff & Phelps's analysis; (iv) reviewing historical and most recent audited financials, business plans, and management

presentations; (v) reviewing individual investment legal documentation; (vi) developing an understanding of the terms, rights and priority of all DLI investments and the terms to any external capital structure applied; (vii) developing a comprehensive understanding of performance metrics, including but not limited to, delinquency, default, recovery, and prepayment ratios; trends in credit mitigation; and other industry-specific performance metrics; (viii) consider DLI's investments performance relative to cohort-based expectations at origination; and, (ix) assess key developments (i.e., any proposed transaction).

58.    As stated above at ¶¶ 3 and 43, once retained, Ross began touting DLI's use of "independent" third-party valuations in the Private Placement Memoranda and Investor Letters. Indeed, the February 2017 Investor Letter specifically hyped Duff & Phelps, stating:

> Finally, to complement our comprehensive internal valuation approach, we have retained Duff & Phelps, a global leader in valuation consulting, to provide quarterly valuation ranges for the fund's assets.    Using their independently formulated valuation range at the portfolio level, we validate our own methodology.    ***Beyond simply confirming that our own valuations fall within their given range, we openly discuss discrepancies and conclusions with their team.***    Through this open dialogue on the analysis and inputs employed, we adapt our own process over time.

59.    As of October 2018, Duff & Phelps began providing monthly valuation reports. The October 2018 Investor Letter reiterated the purported "independence" of Duff & Phelps and explained the third-party valuation process as follows:

> **How the Fund Uses Third Party Valuation: An Explanation of the Recent Change**
>
> As you may know, the Funds work with Duff & Phelps and Lincoln International to provide an independent valuation of each of the Fund positions. Duff is one of the preeminent firms in the third-party valuation space, with over 3500 professionals in 28 countries.    Lincoln is also widely respected, having 500 employees across 20 countries.
>
> ***The reporting we receive from Duff and Lincoln shows a valuation range for each Fund investment.    We use these third-party valuations to provide independent support for our internal valuation methodologies and conclusions. These reports are also made available to the Funds' auditors, Deloitte.    Per our***

***contract with the valuation consultants these reports are not available to investors.***

We began working with Duff in October of 2016, and we added Lincoln in October of 2017.  We contracted with each to receive four reports per year with their views on valuation at each quarter end.  Duff generally required more than 30 days following month end to produce the quarterly report, so we were previously receiving the report after we closed the Funds' books each month.

**Changing from Quarterly to Monthly Valuation Reports**

We recently proposed changes that were approved by an investor vote that concluded on September 25, 2018 to, among other things, facilitate the Funds' move to obtain **monthly** independent, third-party valuation reporting as compared to the prior **quarterly** reporting.

Rather than receive third-party valuation reports quarterly, after we had closed our books for the month, we now receive our reports from Duff and Lincoln monthly, before the monthly closing process is completed and before investor withdrawals take place.

This move to monthly valuation reporting required changes to our previous closing and payment schedule.  The former closing and distribution schedule is shown graphically below in Figure 1.  This former schedule began with the closing of the Funds' books a few days before the end of the month following the month being closed. For example, the Funds' books for the month of June were closed a few days before the end of July, and investor distributions were made a few days after that.

However, since independent third-party valuation reports were previously received on a quarterly basis, the former monthly closing and distributions process did not allow for the opportunity to benefit from the prior validation or potentially useful information derived from these valuation reports.

60.    Duff & Phelps knew that the Limited Partners were informed of Duff & Phelps's initial quarterly "independent" valuations and that the Limited Partners would receive the monthly confirmations of valuations beginning in late 2018.  Indeed, the 2016 Engagement Letter specifically recognized that "[m]anagement intends to use this analysis for the purpose of assisting it in its investment disclosures."  Further, Duff & Phelps knew that the Limited Partners would rely on both the purportedly "independent" cross-check they were supposedly performing and the later valuations in making their investment decisions relating to the Funds.

61.     Duff & Phelps represented in each of its reports that it had conducted the valuations in accordance with ASC § 820, stating, among other things that it had:

- Verified the structure and logic of each model and analyzed all assumptions to ensure that they provided an adequate representation of risks;

- Analyzed all assumptions in light of actual and potential risks and assessed the relevance of each change in assumptions;

- Analyzed all assumptions in light of the actual performance of the collateral; and

- Developed an appropriate valuation approach based on each Investment's characteristics and structure.

62.     And yet, Duff & Phelps failed to meet even the most basic obligations, pointedly ignoring numerous red flags and engendering the fraud perpetrated by Ross and others on the Limited Partners.  More specifically, Duff & Phelps failed to perform the procedures outlined in the Engagement Letter, made material mistakes and materially false representations in the valuations, made gross and reckless errors in valuing the investments resulting in immense overstatements in value on numerous DLI investments, and failed to identify, analyze, or account for known material risks to the investments.

63.     For example, in December 2016 Duff & Phelps abrogated its independence, following instead, DLI's method of forecasting cash flows at a single loss rate rather than performing analysis at the loan level.  Defendant also accepted DLI's approach of modelling certain loans using a zero-loss assumption, failing to use its professional judgment to independently determine whether that was appropriate for each investment.

64.     If Duff & Phelps's "fair value" ranges did not comport with DLI's, Defendant manipulated its own valuations, working to increase the valuations in order to support DLI's predetermined ranges before preparing draft valuation reports.  On one occasion, Duff & Phelps

went so far as to delete discount rate information as "not supportive/too low."  Receiver D&P

Complaint, ¶ 54.

65.     Indeed, based on the Receiver's extensive investigation, the Receiver has publicly

confirmed that "DLI's investments were generally poorly underwritten; inadequately documented,

often without proper credit agreements and securities interests; and inconsistently administered."

*SEC* Action ECF No. 217 at 12.  "The Receiver's investigation has revealed the basis for the losses,

including the discovery as to the nature of the DLI investments; the true likely value of the

investment positions; the real returns on the investments to DLI; and the **inaccurate reporting of**

**investments results and the performance and financial position of counterparties**."  *Id.* at 3.

66.     Duff & Phelps had the opportunity to, and did, discover these facts during its

engagement but ignored the truth of the matters at the behest of Ross in order to continue reaping

valuation fees.  In total, Duff & Phelps performed ten investment valuations for DLI, charging

between $2,000 and $13,500 per report for total fees of $664,000 from late 2016 to 2018.

67.     Instead of independently arriving at fair values for DLI's investments, Duff &

Phelps worked to ensure that its valuations matched DLI's, going as far as to provide draft reports

to DLI and allowing DLI to control not only the fair values, but even the methodology and risk

language in its reports.

68.     Further, in accordance with the Engagement Letter, Duff & Phelps was provided

underlying financial data and documentation on the investments and yet still overvalued the

investments and failed to flag serious problems with a number of the investments.

### C. Fund Investment Misconduct Was Pervasive Leading To Massive Overvaluations That Duff & Phelps Ignored

#### 1. The VoIP Investment Misconduct

69.     VoIP was engaged in telecom factoring, the purchasing of receivables of small "Tier 3" telecom providers who purportedly had contracts with and receivables due from "Tier 1" telecom providers, such as AT&T and Verizon.  VoIP was controlled by Omanoff through various limited liability companies.  DLI described VoIP's business as follows in the Domestic Fund's 2015 Financial Statements:

> The Partnership provides a revolving loan facility with maximum facility amount of $50 million to VoIP Guardian Partners I, LLC (VOIP Guardian).  VOIP Guardian purchases short-term (60 to 90 day) commercial telecommunication invoices (receivables) raised by tier 3 telecom providers that route traffic from calls generated in United States to African and Eastern European countries.  The telecom invoices are payable by Tier 1 telecom providers in the United States and Europe that utilize the services of the tier 3 telecom providers to route the traffic.  The revolving loan facility had an outstanding principal balance of $32.83 million as of December 31, 2015, carried an interest rate of 15% per annum, compounded monthly and has a stated maturity date of September 30, 2020.  The Partnership has a collateral security interest in the commercial telecommunication receivables purchased by VOIP Guardian.  The Partnership is exposed to the risk of default by the account debtor (tier 1 telecom provider) and the originator of the invoice to the extent the receivable needs to be recoursed back to the tier 3 telecom provider.  Such default could result in the Partnership losing value in the underlying collateral leading to lower returns and/or loss of principal on the Partnership's loan facility.  The platform sponsor of VOIP Guardian is also the platform sponsor for Talking Capital LLC, another platform from whom the Partnership buys telecommunication receivables directly.

70.     DLI first invested in VoIP in 2015, providing $32.83 million as of December 31, 2015 to VoIP on a $50 million revolving loan facility.  Over the next three years, the loan facility increased with balances at fiscal year-end for 2016 and 2017 of $99 million and $180 million, respectively.  As of February 8, 2019, the principal loan balance due to the Funds by VoIP was $191.3 million, representing approximately 25% of DLI's aggregate NAV.

71.     According to documents made available to the Limited Partners, as of September 2018, VoIP's borrowing base consisted of 462 "unique positions," with an average collateral value of $32,450, totaling $199,791,828.  Unbeknownst to the Limited Partners and contrary to the documents made available to the Limited Partners, VoIP had only five counterparties with receivables of more than $1 million.

72.     In fact, **_over 80%_** of VoIP's notes receivable securing its debt to the Funds were notes to only **_two_** companies.  VoIP's largest receivable was to TelAcme, Ltd., a Hong Kong based company, amounting to $101.2 million according to VoIP's bankruptcy filings, which TelAcme, Ltd. stopped making payments on in October 2018.  The second largest VoIP receivable was a note for $58 million with Najd Technologies, Ltd., a company headquartered in the United Arab Emirates, and believed to have been based in Bangkok, Thailand.  Najd Technologies, Ltd. stopped paying VoIP in or around October 2018 as well.

73.     On February 11, 2019, the Limited Partners were informed of these VoIP defaults via an Investor Letter (the "February 2019 Investor Letter)" which stated that the principal balance of the Funds' loan to VoIP was $192 million and that beginning in December 2018, VoIP "missed a portion of its interest payment due to the Funds because it did not receive timely payments totaling $18 million for its own obligors. . . . Although VoIP Guardian received $10 million of its delinquent obligor payments in early January 2019, VoIP Guardian did not receive any further payments thereafter."  According to the Investor Letter, the current amount due to VoIP from its delinquent obligors totaled $160 million and "cessation of payments is the likely result of misconduct . . . and that a substantial portion of the $160 million may not be recoverable."

74.     The February 2019 Investor Letter further informed the Limited Partners that of the $33 million due to VoIP from its other obligors, $21 million of that has not been paid on since

2017 due to "a pending Dutch investigation involving VOIP Guardian." As a result of the VoIP defaults, on February 8, 2019, the General Partner "determined to suspend investors' rights to withdraw or redeem from the Funds." In an Investor Letter dated March 19, 2019 (the "March 2019 Investor Letter"), the Limited Partners were informed that VoIP filed a voluntary petition for bankruptcy on March 11, 2019.

75.     Ross allegedly had connections to Omanoff starting at least as early as 2014. According to a complaint[9] filed by Talking Capital LLC and its related entities (collectively, "Talking Capital"), another telecom factoring company, Ross's affiliated companies, including but not limited to the Domestic Fund, made loans to Talking Capital of approximately $180 million (including renewals and rollovers of prior financings), and were the leading source of financing for Talking Capital. Talking Capital was formed in 2014 by Forefront Partners, LLC, Omanoff America Telecom, LLC (an Omanoff controlled entity), and Mudmonth LLC.

76.     As alleged in the Talking Capital complaint, in 2016, Omanoff and others caused Talking Capital to recklessly finance a UK-based Tier 3 telecom provider named Bolotel Limited ("Bolotel") without proper or meaningful due diligence. In total, Talking Capital invested, and lost, $8.5 million in Bolotel. The investment was based on receivables purportedly owed to Bolotel by AV Partners, SRL ("AV Partners"), a European Tier 1 telecom. In reality, AV Partners was a subsidiary of a company that had been in bankruptcy since 2010, "lacking the creditworthiness to justify [Talking Capital's] multimillion-dollar financing of its receivables." Further, Omanoff and others caused Talking Capital's funds to be wired not to Bolotel, but to Bolotel FZE, a separate legal entity based in the United Arab Emirates with whom Talking Capital had no direct agreement or relationship.

---

[9] *Talking Capital LLC v. Rodney Omanoff*, No. 650973/2017 (N.Y. Sup. Ct. Feb. 24, 2017). References herein are to the original complaint filed on February 24, 2017 and the second amended complaint filed on February 13, 2019.

77.     Bolotel allegedly ceased operations in February of 2016 with no trace of Talking Capital's funds.  As alleged, "[t]here is a growing sense that Bolotel . . . is a criminal enterprise, making use of a web of international bank accounts to divert, loot or embezzle the loan proceeds from [Talking Capital]."  In fact, additional details were added to Talking Capital's second amended complaint, which states that Bolotel's banking statements showed zero balances and there was no evidence of any service agreements with Tier 1 telecoms other than the bankrupt AV Partners.

78.     Talking Capital also alleged that Ross violated certain restrictive covenants in funding Omanoff's new competing telecom financing business, VoIP.  Ross, certain DLI associates, and the General Partnership knowingly and recklessly invested in a new business entity with no operating history when choosing to invest in VoIP.  Omanoff aided and abetted in the fraud perpetrated on the Limited Partners, failing to perform adequate due diligence in the Tier 1 telecoms VoIP invested in just as he did with Bolotel.  Ross likely knew of the Bolotel fiasco as of February 2016 due to his involvement with Talking Capital, and yet during 2016, DLI and certain DLI associates extended an additional $66.17 million of the Funds' capital to VoIP, bringing the total investment to $98.9 million by December 31, 2016.

79.     At a minimum, as of February 24, 2017, Ross was on notice of allegations of negligent misconduct against Omanoff in making investment decisions.  And yet, Ross and others not only failed to inform the Limited Partners of these allegations, they continued to increase the Funds' investments in VoIP without conducting additional due diligence.  According to the Funds' annual financial statements, DLI increased the Funds' investments in VoIP again during 2017 by $81.5 million to a total of $180.4 million as of December 31, 2017.  Further, as revealed in VoIP's bankruptcy filings, VoIP had invested almost all of its assets in *only two* companies.

80.     In addition to the above, in April 2017, DLI received a letter from VoIP informing them that BT Netherlands, a Tier 1 company, had withheld approximately $20 million payable to VoIP on suspicion that a Tier 3 company factoring its receivables through VoIP was participating in money laundering.  Receiver Report at 108.

81.     The Receiver has stated that as of December 31, 2019, the par value of the VoIP investment is $202.6 million.  *SEC* Action ECF No. 217 at 8.  According to the Receiver, that value is not expected to be fully recovered "as there are substantial questions and concerns regarding collection of the underlying foreign accounts receivable" and "approximately $22 million from VoIP receives continues to be held in the Netherlands as the funds were seized and are subject to a criminal investigation of Rodney Omanoff and others for money laundering and other criminal claims."  *Id.*

82.     Despite these issues, in 2017 and 2018, DLI and Duff & Phelps continued to value the VoIP investment as low risk because payments were "guaranteed by Tier 1 telecommunications carriers."  Duff & Phelps did not name a single purported Tier 1 carrier or analyze amounts owed from such companies.  *See* Receiver Report at 108.  Tellingly, Duff & Phelps's March 31, 2018 report contained no disclosures regarding the $20 million default relating to BT Netherlands although notice had been provided almost one year earlier.  Duff & Phelps did not address the $20 million default until September 2018, but unsurprisingly failed to address the fact that it had been in existence for well over one year.  Although in possession of knowledge of the default, Duff & Phelps continued to model VoIP with a "zero loss assumption."

83.     Furthermore, as revealed to the Limited Partners in the February 2019 Investor Letter, VoIP ceased making payments to the Master Fund in December 2018, something not revealed to the Limited Partners until almost two months later.  While withholding the defaults

from the Limited Partners and without the Limited Partners' knowledge, DLI continued to fund VoIP with an additional $3 million in December 2018 and $2.2 million in January 2019.

84.    While knowing that VoIP had failed to make its December 2018 payment, the Funds' financial results were presented as positive, with DLI stating in a December 22, 2018 Investor Letter that the estimated return for November 2018 was 0.77%, confirmed by Defendant Duff & Phelps's independent valuation.  At the time of this valuation by Duff & Phelps, the VoIP investment was overvalued by $192.6 million.  Receiver Report at 67.

### 2.    The QuarterSpot Misconduct

85.    Plaintiffs suffered further at the hands of Duff & Phelps with DLI's investment in, and valuation of, QuarterSpot.  QuarterSpot was an online small business lender which advertises "lightning fast" 24-hour approval with funding up to $250,000.

86.    According to the complaint filed in the *SEC* Action, in August 2013, DLI and QuarterSpot entered an agreement wherein DLI would purchase "unsecured payment dependent promissory notes ('Spots') from QuarterSpot."  QuarterSpot would continue to service the loans, keeping a service fee at 17.5% of interest collected.  Between August 2013 and June 2017, DLI's QuarterSpot position (loan principal plus cash value) increased from $427,333 to $149,608,733.  In September 2017, DLI sold approximately $55 million of the QuarterSpot assets at par to DL Global Ltd. ("DL Global"), an investment vehicle run by one of Ross's business associates, a fact that was not disclosed to investors.  Ross pledged, in part, his equity interest in DLI as collateral for a guarantee on the performance of the QuarterSpot assets.  In addition, according to the *SEC* Action, as part of DLI's monthly reporting and closing process, QuarterSpot was required to provide DLI with loan-level data, including performance figures for each loan.

87.    As alleged in the *SEC* Action, between 2014 and at least February 2018, Ross knew of problems with the quality of DLI's QuarterSpot loan portfolio and encouraged QuarterSpot

principals, through email communications, to manipulate the reported loan-level information by delaying recognition of delinquent loans and falsifying borrower payments. The falsified payment figures ranged from just under $20,000 to just under $100,000 for any given month and lead to DLI valuing nonperforming QuarterSpot loans at par when the values should have been reduced to zero.

88.     While DLI received payments, likely from QuarterSpot rebating its servicing fees, the falsifications undermined accurate assessment of the loans, causing the Funds' QuarterSpot position to be overvalued and the Funds' NAV to be inflated. According to the *SEC* Action, the QuarterSpot position was cumulatively overstated by $53 million between 2014 and 2017. When compared to the QuarterSpot investment for 2016 ($122.3 million), the overvaluation represented 43% of the reported value which constituted 7% of the overall net assets of the Funds during 2016.

89.     The Receiver has now stated that pursuant to his investigation, "there is overwhelming evidence to support the allegations related to the fraudulent misreporting of borrowers repayments by QuarterSpot, as alleged in the SEC complaint. In addition, the Receiver has identified strong support for many of the other allegations in the SEC complaint of improper misconduct by DLI." *SEC* Action ECF No. 217 at 3.

90.     Ross "helped engineer false borrower 'payments' that caused many of the loans to be valued at par, instead of their true value of zero, outrightly manipulating the loan values. The amount and timing of the reserves were also manipulated to meet return targets. Between 2014 and 2017, DLI overvalued the QuarterSpot position by approximately $53 million and overstated performance by at least two to three percent annually." Receiver Report at 61.

91.     Duff & Phelps found red flags in the QuarterSpot loan tapes where loans had been changed from "in default" to "late," but knowingly and recklessly failed to question these red flags.

In fact, in Duff & Phelps's December 2016 draft valuation report, Duff & Phelps reported that QuarterSpot had $14.5 million in defaults compared to DLI's report of a mere $1.7 million in defaults.  Duff & Phelps accepted without question DLI's excuse that it had given them the wrong loan tapes and that updated tapes included a "handful of payments" somehow making up the $12.8 million difference in defaults with Duff & Phelps blindly stating "it sounds like the issues appear[] to just be a 'reporting issue with a young/growing platform.'"  Receiver D&P Complaint, ¶ 99.  Duff & Phelps even noted internally after updating its valuation for the final report that DLI would "be pretty happy with that change."  *Id.* at ¶ 98.

### 3.    The Dealstruck Misconduct

92.    Dealstruck Holdings, Inc. ("Dealstruck") was "touted by DLI as early successful consumer loan-based investment, but also overvalued and the purported returns misrepresented." Receiver Report at 62.  In truth, Ross personally held interests in Dealstruck and caused DLI to increase its Dealstruck holdings even though the investment was performing poorly, and valuation adjustments not made for the poor performance.  DLI went so far as to provide Dealstruck with a working capital loan in the summer of 2016 in order for Dealstruck to meet payroll.  *Id.*  DLI foreclosed on the underlying loan portfolios in December of 2016, taking on the responsibility for the slow collection of the loans over time.  *Id.*  The remaining Dealstruck loans were not liquated until October 2019 with the portfolio ultimately yielding only a 2.7% internal rate of return.  *Id.* The Dealstruck investment purportedly had a fair value of $59.1 million as of December 31, 2016 (approximately 7% of the Funds) and $17.3 million as of December 31, 2017.  As of November 2018, it was overvalued by approximately $1.4 million.  *Id.* at 67.

93.    The Dealstruck investment was noted in a July 25, 2018 forty page SEC deficiency letter to DLI, with the letter identifying as a concern "misleading statements and deceitful acts with respect to Dealstruck."  *Id.* at 21.  The SEC letter had additional "areas of concern" as well,

including, among others: (1) misleading statements and omissions regarding consumer loan platforms; (2) misleading and false returns and manipulation of loan loss reserves; (3) misleading statements regarding asset composition and duration; (4) misleading statements regarding conflicts of interest in connection with consumer platforms; (5) misleading statements and deceitful acts related to fee sharing arrangements; (6) concerns about the sufficiency of DLI's compliance; and, (7) concerns about the potentially misleading nature of certain advertisements. *Id.*

94.     Upon information and belief, Duff & Phelps was aware of the SEC letter, received a copy of it, and even aided in responding to the compliance concerns.  Duff & Phelps's Engagement Letter even included language supporting receipt of the SEC letter, stating, in relevant part:

> [T]he parties acknowledge and agree that you may submit the [valuation] Report or any portion thereof to the Securities and Exchange Commission (SEC) in your response to any comment letter issued by the SEC or its staff and you may include any written or verbal references to us, our [valuation] Report or to the Services in such a response: provided that you sent us a prior notice, to the extent permissible and practicable. and allow us a reasonable opportunity to provide input as to the content of such response.

95.     Thus, Duff & Phelps had knowledge of not only the SEC's identified issues regarding Dealstruck's valuations, but the multitude of additional issues at DLI.

### 4.     Additional Investments With Undisclosed Misconduct

LoanHero

96.     LoanHero, Inc. ("LoanHero") represented about 4% of the Funds as of December 31, 2017 (fair value of $34 million).  According to the Receiver, "the performance of [LoanHero] was misrepresented when the collateral supporting the loans was not delivering adequate return." *SEC* Action ECF No. 217 at 15.  DLI attempted to recover some of the loans itself in December 2017, but "[e]ven with the Receiver able to sell the remaining LoanHero portfolio of whole loans

after conducting a robust auction of the LoanHero whole loan portfolio in the late summer and fall of 2019, DLI was forced to write down the value of the investment by $3.3 million." *Id.*

Investment M

97.     The Receiver has also disclosed that in May of 2017, DLI began loaning "tens of millions of dollars to an entity seeking to monetize a patent portfolio primarily through patent litigation (Investment M)." *Id.* at 15.  According to the Receiver, Investment M "was inconsistent with the representations of DLI's investment strategy made to investors; overvalued by DLI; insufficiently underwritten; and the risks to investors were not adequately disclosed." *Id.* at 15-16.

98.     Investment M was a $100 million credit agreement collateralized by Investment M's assets with an 80% loan-to-value ratio.  DLI lent Investment M $15 million initially to purchase an existing patent portfolio from Investment M's owner.  The 55 patent portfolio had an original cost basis of just $1.3 million – ***10 times less*** than the amount loaned to Investment M.

99.     Then, just three months later, the credit agreement was amended to allow Investment M to pay interest and other waterfall costs out of the interest reserve account.  One year later, in August of 2018, DLI permitted Investment M to increase its borrowings and "cease making interest payments, but to instead capitalize the interest payments." *Id.* at 16.  "All the facts and circumstances were not properly disclosed regarding Investment M as it faced the growing challenges." *Id.*

100.    Duff & Phelps knew about both of the Investment M credit agreement amendments and noted them in its valuation reports but failed to account for crucial impacts the amendments could have on the investment and what such amendments revealed about Investment M's financial

status.  Even though the second amendment meant that Investment M was borrowing from DLI to pay DLI, Duff & Phelps *made no adjustments to its valuation of Investment M*.

101.    Similarly, after DLI's initial investment, Investment M significantly changed its business model, moving its patent enforcement strategy almost entirely from the U.S. to China where due to China's developing patent enforcement law there was no historical data on litigation success, and yet no valuation changes were considered with this substantial change and Duff & Phelps continued to model the investment with a zero loss assumption.  In sum, the Receiver's Report dubbed these "a series of foreseeable legal changes almost immediately after DLI began its funding of Investment M that made patent litigation of the type invested in far more challenging and risky."  Receiver Report at 63.

102.    Further, DLI did not assign value to the patents based upon traditional market fair value, but instead based value on a prediction of how much Investment M could receive in a legal settlement against an infringer which was in turn based on Investment M's historical performance with the assumption that the same performance would continue.  Duff & Phelps did not question this valuation method and even determined that Investment M was over-collateralized, reducing its discount rate by 1%.  Duff & Phelps did so knowing that the patents were valued by another firm and noting that the firm "has not analyzed the patents or the claim charts with any significant level of detail."  In addition, Duff & Phelps used the same benchmarks for its fair value calculations as it used for another DLI investment, an investment that in no way resembled Investment M being a business that provided online credit to small businesses.

103.    The Receiver has been able to recover only $6.8 million of the $62 million par value for Investment M, with a measly $2 million of additional payments expected to be forthcoming.

*SEC* Action ECF No. 217 at 16.  As of November 2018, Investment M was overvalued by approximately $52.1 million.  Receiver Report at 67.

Investments H and I

104.    Investments H and I are another example of DLI's pervasive overvaluation practices and Duff & Phelps's failure to exercise independency.  Investments H and I involved loans to a consumer finance company specializing in point-of-sale financing.  DLI was to receive a 16% return on a preferred equity investment in a joint venture with the company that would purchase consumer loans ("Investment I"), but 16% was more than the earnings from the loans the company purchased.  The company parent was supposed to pay the difference between the joint venture's actual profits and the promised return to DLI, but instead the company parent obtained a corporate loan from DLI to pay the losses ("Investment H").  Unsurprisingly, the company parent could not pay back DLI, borrowing more and more money.

105.    According to the Receiver, Duff & Phelps's work product for Investment H's valuations "reflected a total lack of care or competence" with Duff & Phelps "wrongfully combin[ing Investments H and I] into a single investment and fail[ing] to disclose or account for the difference risks and values associated with each, despite one being a corporate loan to a parent entity and one being an equity investment in a joint venture that purchased loans."  Receiver D&P Complaint, ¶ 73.  Additionally, Duff & Phelps made the bald assumption that the joint venture would always pay the 16% guaranteed return with no independent analysis of whether that assumption was correct (which it was not).

106.    Duff & Phelps also failed to consider that DLI had agreed not to receive cash returns on the joint venture for several years and that the majority of interest owed on Investments H and

I were never paid in cash but capitalized.  These overt failures led to Investments H and I being overvalued by approximately $141.8 million as of November 2018.  Receiver Report at 67.

Investment T/S

107.    Another DLI investment with significant overvaluation was Investment T/S, a Los Angeles based "fix and flip" real estate acquisition company.  Investment T/S was one of DLI's largest investments and far from DLI's stated investment strategy.

108.    DLI began lending large sums of money to Investment T/S in 2015 pursuant to a credit facility ("Investment T").  In total, DLI loaned Investment T/S over $230 million.  Investment T was purportedly secured by the flip properties and a $100 million personal guaranty, but there was little due diligence performed on Investment T's ability to pay, and payments from Investment T/S were in fact slow and its collateral deficient.

109.    As with DLI's other investments, Duff & Phelps accepted DLI's valuations without question, ignoring Investment T/S's poor financial condition with its capitalized interest added to its loan principal and declining sales, failing to consider the probability of repayment by Investment T/S with an April 2016 net loss of $13.2 million and accrued interest of $7.7 million, and blindly accepting that the personal guarantor could cure any under-collateralization.  Duff & Phelps once again found a red flag with DLI's value of Investment T/S and once again failed to appropriately address it.

110.    More specifically, despite the above, Duff & Phelps's September 30, 2016 valuation report stated "D&P's analysis of Investment TS's historical return on investment suggests that a loss is highly unlikely" and that there was a typical five- to- six month turnover of properties and 25-35% annualized returns.  Receiver D&P Complaint, ¶ 106.  The report stated that the personal guarantor had guaranteed the loans "with his substantial assets" with absolutely

no description of those "substantial assets" and when in fact a simple asset check would have shown that the personal guarantor lacked liquid assets to cover the guaranty. *Id.*

111.    Investment T/S's financial condition continued to deteriorate over the next year with Investment S's financial statements for 2017 showing a member deficit of -$4.5 million, sales for the last six months of 2017 of $29.8 million, expenses of $34.1 million, and a net loss of $4.3 million. Likewise, Investment S's cash flows from operating activities for the same period were -$4.3 million, net borrowing from revolving line of credit -$107.6 million, and net increase in cash from financing activities $2.7 million – it was readily apparent Investment S's cash was not from operations, but from financing. And yet, Duff & Phelps's September 30, 2017 valuation report stated that it "considered the proximity of the funding date to the Valuation Date" and that as "only a few months have elapsed since the funding date, and significant cash floor surveillance is not yet available, D&P has valued the [Investment S] Fund Portfolio on a cost basis." Receiver D&P Complaint at ¶ 108.

112.    Duff & Phelps failed to prepare any true valuation of Investment T/S over the entirety of its engagement. It never substantiated the assets of the personal guarantor and while acknowledging that Investment T/S was undercollateralized, simply stated without any apparent investigation into feasibility that the guarantor "is currently working in good faith to resolve this situation with a solution that may include, among other things, adding additional collateral, sale of properties, and/or monetization of other personal assets of the guarantor." *Id.* at ¶ 109. As of November 2018, Investment T/S was overvalued by $48.2 million. Receiver Report at 67.

### 5.    Duff & Phelps's Material Failures

113.    Duff & Phelps's Engagement Letter stated that it would conduct valuations in accordance with certain procedures, and more importantly calculate "fair value" in accordance

with ASC Section 820.  Duff & Phelps had access to DLI's records and employees in making its "fair value" determinations.

114.    As stated *supra*, Duff & Phelps knew that DLI touted Duff & Phelps's "independent" valuations to investors in both the Private Placement Memoranda and Investor Letters, in part inducing investment in the Funds and continued investment holdings in the Funds. As of October 2018, Duff & Phelps began providing monthly valuation reports to DLI.  Therefore, in the Investor Letters from October 2018 forward, DLI referenced the monthly valuation from Duff & Phelps.

115.    In accordance with the new monthly valuation reports provided by Duff & Phelps, the Domestic Fund's November 2018 Investor Letter stated: "We have received our third-party valuation reporting from Duff & Phelps and Lincoln Partners, and we are able to confirm our previous estimate of 0.75% for the month ending October 31, 2018 is the final performance return for that month."

116.    Similarly, the Domestic Fund's December 2018 Investor Letter stated: "We have received our third-party valuation reporting for November, and we are able to confirm that the previous estimate of 0.77% for the month ending November 30, 2018 is the final performance net return for that month."

117.    Given the access to information as required by their Engagement Letter, Duff & Phelps knew of the fraud perpetuated on the Limited Partners as described herein.

118.    As more fully described herein, the statements of net returns in the 2018 Investor Letters, and purported valuation confirmations by Duff & Phelps, were materially false and misleading when made and/or failed to disclose the following:

a.   **Value of loans**.  Ross, Duff & Phelps, and certain others failed to disclose that up to 40% of the loan portfolio constituting the Funds' assets was worthless and payments to investors were not exclusively obtained from the loans, but from new investors, similar to a Ponzi scheme.

b.   **Collateral for loans**.  Ross, Duff & Phelps, and certain others failed to disclose that the majority of the collateral securing the loans constituting the Funds' assets was uncertain and speculative, and, thus any return was unreliable and unlikely to continue.

c.   **QuarterSpot**.  Ross, Duff & Phelps, and certain others overstated the value of the Funds' investment in QuarterSpot, representing 15% of all the Funds' assets as of December 31, 2017.

d.   **VoIP**.  Ross, Duff & Phelps, and certain others failed to disclose that, although the Funds' investment in VoIP increased in 2018:  (i) VoIP was a start-up run by Omanoff; (ii) Omanoff had operated a fraudulent company, Bolotel, which was purportedly in the same business as VoIP; (iii) Ross had learned that VoIP was not following its investment guidelines to invest in companies which dealt only with Tier 1 telecom companies; and (iv) 80% of VoIP's receivables were owned by just two foreign companies.

e.   **Additional Investments with Undisclosed Misconduct**.  Ross, Duff & Phelps, and certain others failed to disclose that numerous other Master Fund investments were poorly underwritten, documented, and maintained; inaccurately reflected the level of risk; and/or were overvalued.

119.    Had Plaintiffs known of the intentional acts described herein and/or the true value and issues plaguing DLI's investments that Duff & Phelps failed to discover through inadequate valuations and/or discovered and failed to disclose, Plaintiffs would not have initiated their investments in the Funds and/or would have withdrawn their investments in the Funds.

###    D.    DLI and the Funds Collapse

120.    As stated above, on February 11, 2019, the Limited Partners were informed via investor letter that withdrawals and redemptions were suspended effective February 8, 2019 as a result of VoIP failing to make its regular interest payments due to the Funds.

121.    On March 19, 2019, via an Investor Letter to the Limited Partners, DLI revealed a "potential overstatement" with the QuarterSpot position and that Ross had resigned as DLI's CEO and managing member and as a member of the board of directors of the Offshore Fund as of March 18, 2019.  The March 2019 Investor Letter also informed investors that VoIP had filed a voluntary petition for bankruptcy on March 11, 2019.  Just three days later, on March 22, 2019, the *SEC* Action was filed in the U.S. District Court for the Central District of California.

122.    On April 1, 2019, the Court in the *SEC* Action appointed the Receiver.  Limited Partners were notified of the receivership in a letter dated April 12, 2019.

123.    On April 9, 2020, the Court in the *SEC* Action granted the Receiver's motion for approval of claims procedure for potential creditors and investors, establishing a bar date for the filing of claims by investors and creditors of the U.S. Receivership Entities of July 7, 2020.  *SEC* Action ECF No. 251.

124.    As of April 24, 2020, the Receiver estimated that of the DLI portfolio's par value of $789.6 million as of March 31, 2019, the return on the liquidation of the investments will be in between $215 million and $265 million, before expenses.  *SEC* Action ECF No. 262 at 3.

125.     On November 13, 2020, the Receiver issued an extensive report detailing his investigation into the conduct of DLI and Ross, as well as others, describing the Funds as a Ponzi scheme and reporting, *inter alia*, that the Funds' NAVs were grossly overstated.

## CLASS ACTION ALLEGATIONS

126.     Plaintiffs bring this action as a class action pursuant to Rule 23 the Federal Rules of Civil Procedure on behalf of all persons and/or entities who were Limited Partners during the relevant period herein, and who were damaged thereby (the "Class"). Excluded from the Class are Defendant, the officers, directors and affiliates Defendant, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which or Defendant has or had a controlling interest. Plaintiffs reserve the right to amend the Class and definitions if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

127.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by DLI and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in similar class actions.

128.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendant's wrongful conduct  complained of herein.

129.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and litigation of this nature.

130.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Common questions include, but are not limited to, the following:

(a)    whether Defendant knowingly participated in the fraud and/or knowing or reckless misrepresentations of Ross and certain others, thereby aiding and abetting their fraud;

(b)    whether the Defendant negligently misrepresented the Funds' NAV;

(c)    whether Defendant aided and abetted Ross and certain others in making negligent misrepresentations;

(d)    whether the Defendant aided and abetted Ross and certain others in breaches of fiduciary duties; and

(e)    whether Plaintiffs and the Class have sustained damages as a result of Defendant's conduct.

131.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I
### Aiding and Abetting Fraud

132.    Plaintiffs incorporate by reference each and every allegation set forth above as if fully set forth herein.

133.    Ross and certain others (the "Fraud Actors") intentionally made numerous misstatements and misrepresentations to Plaintiffs and Class members, and/or concealed or failed

to disclose material information to Plaintiffs and Class members, that they knew not to be true or did not believe to be true, including, but not limited to: (i) that the General Partner performed adequate due diligence on the Funds' investments both initially and on an ongoing basis; (ii) that the valuations of the Funds' investments were accurate; and (iii) that the Funds' risk assessments were accurate.

134.    The Fraud Actors knew that the representations they made were false when made and made the intentional misrepresentations or omissions with the intent that Plaintiffs and members of the Class rely upon those misstatements or omissions.

135.    The Fraud Actors' false and misleading representations, concealment, or silence induced Plaintiffs and Class members to invest in the Funds and/or forbear from redeeming their investments in the Funds.

136.    Plaintiffs and Class members justifiably relied upon the false and misleading representations, concealment, or silence, which induced them to invest in the Funds and/or forbear from redeeming their investments in the Funds.

137.    Duff & Phelps aided and abetted the fraud perpetrated by the Fraud Actors.  Duff & Phelps knew DLI, Ross, and the Fraud Actors owed duties to the Plaintiffs and members of the Class and substantially assisted DLI, Ross, and certain Fraud Actors in the perpetrating the fraud as described herein.

138.    As alleged in detail above, Duff & Phelps performed valuations on the Funds' investments and had access to the investment documentation in making those valuations.  Duff & Phelps had actual knowledge, or consciously disregarded, of the fact that DLI, Ross and the Fraud Actors were making false and misleading representations to Plaintiffs and the Class concerning the Funds' investments and valuations.

139.    As alleged in detail above, Duff & Phelps had actual knowledge, or consciously disregarded, that the loan portfolio was grossly over-valued, but issued reports that the loan portfolio was as falsely represented by Ross and DLI.

140.    Duff & Phelps provided substantial assistance to DLI, Ross and the Fraud Actors' fraud.  Duff & Phelps knew that its false statements were being sent to Plaintiffs and Class members and that Plaintiffs and members of the Class would rely on the false statements and the existence of Duff & Phelps's independent valuation.  Duff & Phelps acted to with the intention of advancing the fraud's commission.  Because of the veneer of legitimacy that Duff & Phelps gave to Ross's and DLI's statements, as detailed above, DLI, Ross and the Fraud Actors were able to carry out the fraudulent scheme described herein.

141.    Accordingly, Defendant Duff & Phelps knowingly participated in the fraud and/or recklessly disregarded the fraud by the Fraud Actors and are liable to Plaintiffs and members of the Class for damages.

## COUNT II
### Negligent Misrepresentation

142.    Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein, except for those averring fraud.

143.    Duff & Phelps had an independent duty to Plaintiffs and the Class (separate and apart from its contractual duties owed to DLI) to provide accurate valuation statements.  As the independent valuation provider for the Funds, Duff & Phelps had a special relationship with Plaintiffs and the Class to provide accurate information because it knew that Plaintiffs and the Class would rely upon its valuations in making material financial decisions. Duff & Phelps knew that Plaintiffs and the Class wanted the independent valuations to assess the information provided by DLI and to determine whether to invest or continue their investments in the Funds.

144.    Duff & Phelps breached this duty by making numerous false and misleading representations about the Funds' NAV and the valuation of the Funds' investments to Plaintiffs and Class members.  Duff & Phelps knew that the valuations it provided were false and misleading because Duff & Phelps had access to financial information underlying the Funds' investments which conflicted with the valuations provided by DLI and, ultimately, by Duff & Phelps.

145.    Duff & Phelps was grossly negligent in their failure to exercise reasonable care. Defendant's conduct was an extreme departure from the ordinary standard of care and more than ordinary inadvertence or inattention.

146.    Duff & Phelps knew that its false and misleading valuation statements were being sent to Plaintiffs and Class members and that Plaintiffs and members of the Class would rely on the statements.

147.    Plaintiffs and the members of the Class reasonably relied on Duff & Phelps valuation statements in deciding to invest in the Funds and/or to continue holding their Limited Partnership interests and not redeeming those interests.  Plaintiffs' reliance on Defendant's false and misleading representations was a substantial factor in causing their harm.

148.    As a result of Duff & Phelps's conduct, Plaintiffs and members of the Class have suffered and continue to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

## COUNT III
### Aiding and Abetting Negligent Misrepresentations

149.    Plaintiffs incorporate by reference each and every allegation set forth above as if fully set forth herein.

150.    Defendant Duff & Phelps aided and abetted in the negligent misrepresentations made by Ross and certain others.

151.    As alleged herein, Duff & Phelps performed valuations on Funds' investments and would have had access to the investment documentation showing representations to be false in making those valuations.

152.    As a result, Duff & Phelps knew that the loan portfolio was grossly over-valued.

153.    Duff & Phelps knew that false statements were being sent to Plaintiffs and Class members and that Plaintiffs and members of the Class would rely on the false statements.

154.    Accordingly, Duff & Phelps is liable to Plaintiffs and Class members for damages resulting from Ross's and certain others' negligent misrepresentations.

## COUNT IV
### Aiding and Abetting Breach of Fiduciary Duties

155.    Plaintiffs incorporate by reference each and every allegation set forth above as if fully set forth herein.

156.    Defendant Duff & Phelps aided and abetted Ross's and DLI's breaches of fiduciary duties to Plaintiffs and Class members.  Duff & Phelps knew the Funds were limited partnerships and that Ross and DLI (and possibly others) owed fiduciary duties to the Funds' Limited Partners, including Plaintiffs and other members of the Class.

157.    DLI and Ross (and possibly others) breached their fiduciary duties to Plaintiffs and the Class by, among other things, permitting them to given fraudulent information concerning DLI's financial condition.

158.    Based on Duff & Phelps's access to the loan/investment documents in performing its duties, *inter alia*, Duff & Phelps had actual knowledge, or consciously disregarded, that DLI and Ross breached their fiduciary duties, knowing that DLI and Ross had overvalued the Funds' investments and that DLI and Ross were providing misleading valuations and other false information to the Limited Partners.

159.    Duff & Phelps knowingly participated and substantially participated in DLI and Ross's fiduciary breaches by knowingly providing false and misleading valuations and failing to conduct proper independent valuations of the Funds' investments.  Duff & Phelps knew that DLI and Ross would provide the purportedly independent valuations to the Limited Partners in order to further DLI and Ross's breaches of fiduciary duty.

160.    As a result of Duff & Phelps's conduct, Plaintiffs and members of the Class have suffered and continue to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

(A)    Declaring this action to be a class action and certifying Plaintiffs as representatives of the Class and their counsel and Class counsel;

(B)    Awarding all forms of recovery allowed under law and equity, including rescission, restitution, disgorgement, injunctive and other equitable relief, compensatory, and punitive damages, in favor of Plaintiffs and the other members of the Class;

(C)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, experts' fees, and costs; and

(D)    Granting such other relief as the Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

DATED:  February 3, 2022                    Respectfully submitted,

                                        **BRAGAR EAGEL & SQUIRE, P.C.**

                                        By: /s/ *Lawrence P. Eagel*

Lawrence P. Eagel
David J. Stone
810 Seventh Avenue, Suite 620
New York, NY 10019
Telephone: (212) 308-5858
Facsimile: (212) 214-5858

and

Marion C. Passmore
445 S. Figueroa Street, Suite 3100
Los Angeles, California 90071
Telephone: (213) 612-7735
Facsimile:  (212) 214-0506
Email:  passmore@bespc.com