# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

Andrew Baer, Individually and as Trustee of
the Andrew J. Baer Trust; Michael
Rosenbloom, Individually and as Trustee with
Robyn Rosenbloom of the Michael
Rosenbloom Revocable Trust; Wing Point
Investments LLC; Eytan Turjeman; Naamith
Heiblum; Mordehai Heiblum; Rachel
Heiblum; Yehudith Heiblum; Zohar Heiblum;
Reuven Heiblum; Greg Isaacs; Bernard E.
Francois, as Trustee of the Bernard E. Francois
Living Trust; Seth Rosenberg; Deborah
Loughman; John Miller, Individually and as
Trustee of the Miller Trust; and Sierra Springs
Diversified Income Fund, LP, Atkins
Investment Partnership; Edward Atkins, trustee
of the Edward M. Atkins Trust; Vernon James
Armour, trustee of the Vernon James Armour,
Trust dated 04/04/1988 and the Vernon James
Armour Trust dated 08/14/2018; Ronald
Berman, trustee of the Ronald Berman
Revocable Trust; Elizabeth Blinderman; Paul
Blinderman, trustee of the Paul Blinderman
Revocable Trust; Joseph M. Boniecki; Patricia
Booth, trustee of the Patricia Booth Revocable
Trust and the Laurence O. Booth Irrevocable
Family Trust of 2012; Anne Burke; John
Burke; Christopher John Burke; Francis
Campise; Joseph Campolo, Jr. individually and
as trustee of the Joseph P Campolo Jr.
Revocable Trust; Joseph S. Chasen; Mari
Christopherson, trustee of the Mari Louisa
Christopherson Trust; Amy Chuckrow and
Jonathan Stulgis, trustees of the Trust Under
the Will of Robert Chuckrow Deceased;
Sherwood Guernsey, trustee of the Carol C.
Guernsey Irrevocable Trust; Phillip Crump;
David Decker, Sr. individually and as trustee
for the Mary Louise Decker Family GST
Trust; David Decker, Jr., trustee of the 2017
Decker Family Irrevocable Gift Trust; 2012
DPDS Fund L.P.; Barbara Drumm; Dusty47
LLC; Four J Family LLC; Jeffrey Goldberg,

CASE NO:  22-CV-0994 (JMF)

**CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT FOR DAMAGES**

**DEMAND FOR JURY TRIAL**

trustee of the Jeffrey M. Goldberg Trust u/a
dtd 08/01/1995; Harmony Investments LLC;
Charles Harrold, III; Margaux Marbury
Harrold; Stephanie Harrold, trustee of the
Stephanie A. Harrold Revocable Trust; Nancy
Lynn Morton, trustee of the Harrold Family
Dynasty Trust; Charles Cotton Harrold IV,
trustee of the C. Cotton Harrold IV Investment
Trust; JP Morgan Trust Company of Delaware,
trustee of the Trust Under the Will of Marion
E. Horween FBO Nancy Horween Trust; JP
Morgan Trust Company of Delaware, trustee
of the Trust Under the Will of Marion E.
Horween FBO Lisa Horween Kelly; Sally Jo
Morris, trustee of the Suzanne Kanis
Revocable Trust; Ronald D. Kaplan; Michael
R. Kaskie; Kilrea Family Investments, LLC;
Scott Kilrea, trustee of the Scott Kilrea Trust
U/A DTD 04/14/1997; John Henry Koehler
III; Sandra Sue Koehler; Karl Henry John
Koehler III and Inna Koehler, trustees of the
Jay Koehler and Inna Koehler Living Trust;
Kreiseder Family LLC; LTR I LLC; Sheffee
Lulkin; Shefee Lulkin & Associates, Inc.; John
L MacCarthy, trustee of the John Leland
MacCarthy Revocable Trust; John D.
Marschall, trustee of the John D. Marschall
Trust; Peter J. McDonald, trustee of the Peter
J. McDonald Trust DTD 04/22/2010; William
McKenna; Nancy Mengel; Robert Mueckler,
II; Steven Patrick Nedelka; Holly Nelson-
Johnson and Terry Nelson-Johson, trustees of
the E. Holly Nelson-Johnson Family
Irrevocable Trust; Mark Ordower, trustee of
the Mark Ordower Trust; Ordower
Investments; James Papesch; Peer Pedersen,
Jr., trustee of the Declaration of Trust of Peer
Pedersen; John Muehlstein, trustee of the Peer
Pedersen Trust; Barry Lance Polonitza;
Ruthmarie Connor, trustee of the Rollin
Polonitza Family Trust; Mary Polonitza,
trustee of the Jard Polonitza Separate Property
Trust; Beri Lynn Polonitza, trustee of the Beri
Lynn Polonitza Revocable Trust; Phillip
Porpora, trustee of the Phillip Porpora Trust;
Liza Reynolds Limited Partnership; RJDC

Management Company LLC; Scott Anthony
Ronan; Kimberly Seeds; James Sharman;
Victoria Clewell, trustee of the Ronald J.
Sloane Family Trust; SSSB Partnership;
Jonathan Stulgis, trustee of the Jonathan W.
Stulgis Family Trust; Doris J. Wik; Frances
Armour Williamson, trustee of the Frances
Armour Williamson TTEE Revocable Trust of
Frances Armour Williamson; Yiming Zhang;
Stephen Jay Akana; Harminder Brar and
Pearlene Brar as trustees of the Brar Family
Trust; Robert Brilliant, trustee of the Brilliant
Family Trust; Jerome Yap Chua; Orla
Cunningham, LLC; Barry P. Garrison, trustee
of the Barry P. Garrison; Eugene Goebel; Jessa
Ann Goebel; Stephanie Marie Grein; Brent
Horowitz and Heather Thompson as trustees of
the Horowitz Family Trust; Julie Lewis; Stacy
K. Li; Ronald McLeod, trustee of the Ronald
McLeod Revocable Trust; John D. Michael;
Daniel Michael and Lillian Leong as trustees
of the Michael Leong Family Trust DTD
08/13/2013; Jennifer Mvongo, trustee of the
Jennifer M. Mvongo Revocable Trust; Ramesh
Patel and Alison Patel, trustees of the R. Patel
and A. Patel TTEE, Kenew DBP U/A DTD
12/31/2016; David Malcolm Potts; Thomas F.
Reiser, Jr.; James E. Salter; Ridge Sampson,
trustee of the Ridge Sampson Revocable Trust;
Aaron Michael Silva; Gerald Guy Stokes, Jr.;
Max Luis Tejada; Trinh-Mai N. Vo; Bret M.
Walberg; Michael Witlin; Bennet Woodward;
Dimitri Katamanin, individually and as trustee
of the Four Season's Trust; Sameer Kero,
trustee of the Flexedge Investment
Management Defined Benefit Pension Plan &
Trust; Sameer Kero; Chanda Mehta Kero; N.
Kero Investments, LTD., LLLP; S. Kero
Limited Partnership; Niloufer Kero; Niloufer
Kero, trustee of Niloufer Kero Revocable
Family Trust; Shawkat Kero; Sarita Mehta;
Narendrakumar Mehta; Smita Mehta;
Pareshkumar Desai; Etienne Boillot and Stuart
E. Lucas, trustees of the GST Trust; Anthony
V. Dub; Michael Driscoll; Neal Driscoll; Alia
Driscoll; Dennis J. FitzSimons; U.S. Bank N.A

and Soyla V. Rausch as trustee for the Carrie G. Cox TUW Tr. B FBO Mary Hancock and the Harriet C. Collis TUA Tr. B FBO Mary Hancock; William Wayne Hancock III, trustee of the George B. Hancock Trust; John Vance Hancock; Nancy A.D. Hancock; Michael Harrigan individually and as trustee for the Michael J. Harrigan Trust; John H. Heuberger, trustee of the WBK 2012 Trust; Loeb Holding Corporation; Armando Pauker; Mary Ellen Henske; SAS ARDIS; Vasundhara Tolia; Osman Uslu; Bret M. Walberg; Shai Wininger; Philip Nadel; Blair Ambach; Chancellor Capital; John W. Buttrick; Peter T. Lambrakis; Rajesh Kannah Ramanujam & Priya Ravi; Warrington Capital LLC; Jack Frank Aronov; Etienne Boillot; Lisa D. Gagnum Boillot; Palamine Holdings, LLC; Christopher John Burke, as trustee of the Matrix Capital Advisors LLC Employee Savings Plan; John P. Roy Jr.; Margaret Rockwell; Eleanor Robinson as beneficiaries of the John P. Roy IRA account; Theodore Strange; Individually and on Behalf of All Others Similarly Situated

        Plaintiffs,

    v.

Duff & Phelps, LLC; and Does 1 through 20,

        Defendants.

Plaintiffs Andrew Baer, individually and as trustee of the Andrew J. Baer Trust; Michael Rosenbloom, individually and as trustee with Robyn Rosenbloom of the Michael Rosenbloom Revocable Trust; Wing Point Investments LLC; Eytan Turjeman; Naamith Heiblum; Mordehai Heiblum; Rachel Heiblum; Yehudith Heiblum; Zohar Heiblum; Reuven Heiblum; Greg Isaacs; Bernard E. Francois, as trustee of the Bernard E. Francois Living Trust; Seth Rosenberg; Deborah Loughman; John Miller, individually and as trustee of the Miller Trust; and Sierra Springs Diversified Income Fund, LP, Atkins Investment Partnership; Edward Atkins, trustee of the Edward M. Atkins Trust; Vernon James Armour, trustee of the Vernon James Armour, Trust dated 04/04/1988 and the Vernon James Armour Trust dated 08/14/2018; Ronald Berman, trustee of the Ronald Berman Revocable Trust; Elizabeth Blinderman; Paul Blinderman, trustee of the Paul Blinderman Revocable Trust; Joseph M. Boniecki; Patricia Booth, trustee of the Patricia Booth Revocable Trust and the Laurence O. Booth Irrevocable Family Trust of 2012; Anne Burke; John Burke; Christopher John Burke; Francis Campise; Joseph Campolo, Jr. individually and as trustee of the Joseph P Campolo Jr. Revocable Trust; Joseph S. Chasen; Mari Christopherson, trustee of the Mari Louisa Christopherson Trust; Amy Chuckrow and Jonathan Stulgis, trustees of the Trust Under the Will of Robert Chuckrow Deceased; Sherwood Guernsey, trustee of the Carol C. Guernsey Irrevocable Trust; Phillip Crump; David Decker, Sr. individually and as trustee for the Mary Louise Decker Family GST Trust; David Decker, Jr., trustee of the 2017 Decker Family Irrevocable Gift Trust; 2012 DPDS Fund L.P.; Barbara Drumm; Dusty47 LLC; Four J Family LLC; Jeffrey Goldberg, trustee of the Jeffrey M. Goldberg Trust u/a dtd 08/01/1995; Harmony Investments LLC; Charles Harrold, III; Margaux Marbury Harrold; Stephanie Harrold, trustee of the Stephanie A. Harrold Revocable Trust; Nancy Lynn Morton, trustee of the Harrold Family Dynasty Trust; Charles Cotton Harrold IV, trustee of the C. Cotton Harrold IV Investment Trust;

JP Morgan Trust Company of Delaware, trustee of the Trust Under the Will of Marion E. Horween FBO Nancy Horween Trust; JP Morgan Trust Company of Delaware, trustee of the Trust Under the Will of Marion E. Horween FBO Lisa Horween Kelly; Sally Jo Morris, trustee of the Suzanne Kanis Revocable Trust; Ronald D. Kaplan; Michael R. Kaskie; Kilrea Family Investments, LLC; Scott Kilrea, trustee of the Scott Kilrea Trust U/A DTD 04/14/1997; John Henry Koehler III; Sandra Sue Koehler; Karl Henry John Koehler III and Inna Koehler, trustees of the Jay Koehler and Inna Koehler Living Trust; Kreiseder Family LLC; LTR I LLC; Sheffee Lulkin; Shefee Lulkin & Associates, Inc.; John L MacCarthy, trustee of the John Leland MacCarthy Revocable Trust; John D. Marschall, trustee of the John D. Marschall Trust; Peter J. McDonald, trustee of the Peter J. McDonald Trust DTD 04/22/2010; William McKenna; Nancy Mengel; Robert Mueckler, II; Steven Patrick Nedelka; Holly Nelson-Johnson and Terry Nelson-Johson, trustees of the E. Holly Nelson-Johnson Family Irrevocable Trust; Mark Ordower, trustee of the Mark Ordower Trust; Ordower Investments; James Papesch; Peer Pedersen, Jr., trustee of the Declaration of Trust of Peer Pedersen; John Muehlstein, trustee of the Peer Pedersen Trust; Barry Lance Polonitza; Ruthmarie Connor, trustee of the Rollin Polonitza Family Trust; Mary Polonitza, trustee of the Jard Polonitza Separate Property Trust; Beri Lynn Polonitza, trustee of the Beri Lynn Polonitza Revocable Trust; Phillip Porpora, trustee of the Phillip Porpora Trust; Liza Reynolds Limited Partnership; RJDC Management Company LLC; Scott Anthony Ronan; Kimberly Seeds; James Sharman; Victoria Clewell, trustee of the Ronald J. Sloane Family Trust; SSSB Partnership; Jonathan Stulgis, trustee of the Jonathan W. Stulgis Family Trust; Doris J. Wik; Frances Armour Williamson, trustee of the Frances Armour Williamson TTEE Revocable Trust of Frances Armour Williamson; Yiming Zhang; Stephen Jay Akana; Harminder Brar and Pearlene Brar as trustees of the Brar Family Trust; Robert Brilliant, trustee of the Brilliant Family Trust; Jerome Yap Chua;

Orla Cunningham, LLC; Barry P. Garrison, trustee of the Barry P. Garrison; Eugene Goebel; Jessa Ann Goebel; Stephanie Marie Grein; Brent Horowitz and Heather Thompson as trustees of the Horowitz Family Trust; Julie Lewis; Stacy K. Li; Ronald McLeod, trustee of the Ronald McLeod Revocable Trust; John D. Michael; Daniel Michael and Lillian Leong as trustees of the Michael Leong Family Trust DTD 08/13/2013; Jennifer Mvongo, trustee of the Jennifer M. Mvongo Revocable Trust; Ramesh Patel and Alison Patel, trustees of the R. Patel and A. Patel TTEE, Kenew DBP U/A DTD 12/31/2016; David Malcolm Potts; Thomas F. Reiser, Jr.; James E. Salter; Ridge Sampson, trustee of the Ridge Sampson Revocable Trust; Aaron Michael Silva; Gerald Guy Stokes, Jr.; Max Luis Tejada; Trinh-Mai N. Vo; Bret M. Walberg; Michael Witlin; Bennet Woodward; Dimitri Katamanin, individually and as trustee of the Four Season's Trust; Sameer Kero, trustee of the Flexedge Investment Management Defined Benefit Pension Plan & Trust; Sameer Kero; Chanda Mehta Kero; N. Kero Investments, LTD., LLLP; S. Kero Limited Partnership; Niloufer Kero; Niloufer Kero, trustee of Niloufer Kero Revocable Family Trust; Shawkat Kero; Sarita Mehta; Narendrakumar Mehta; Smita Mehta; Pareshkumar Desai; Etienne Boillot and Stuart E. Lucas, trustees of the GST Trust; Anthony V. Dub; Michael Driscoll; Neal Driscoll; Alia Driscoll; Dennis J. FitzSimons; U.S. Bank N.A and Soyla V. Rausch as trustee for the Carrie G. Cox TUW Tr. B FBO Mary Hancock and the Harriet C. Collis TUA Tr. B FBO Mary Hancock; William Wayne Hancock III, trustee of the George B. Hancock Trust; John Vance Hancock; Nancy A.D. Hancock; Michael Harrigan individually and as trustee for the Michael J. Harrigan Trust; John H. Heuberger, trustee of the WBK 2012 Trust; Loeb Holding Corporation; Armando Pauker; Mary Ellen Henske; SAS ARDIS; Vasundhara Tolia; Osman Uslu; Bret M. Walberg; Shai Wininger; Philip Nadel; Blair Ambach; Chancellor Capital; John W. Buttrick; Peter T. Lambrakis; Rajesh Kannah Ramanujam & Priya Ravi; Warrington Capital LLC; Jack Frank

Aronov; Etienne Boillot; Lisa D. Gagnum Boillot; Palamine Holdings, LLC; Christopher John Burke, as trustee of the Matrix Capital Advisors LLC Employee Savings Plan; John P. Roy Jr.; Margaret Rockwell; Eleanor Robinson as beneficiaries of the John P. Roy IRA account; and Theodore Strange (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, by and through Plaintiffs' undersigned counsel, bring this amended class action complaint against Duff & Phelps, LLC ("Defendant," "Duff & Phelps," or, together with the Does, "Defendants") based upon the investigation of counsel and information and belief.

## NATURE OF THE ACTION

1.      This is an action for aiding and abetting fraud, aiding and abetting breach of fiduciary duty, negligent misrepresentation and aiding and abetting negligent misrepresentation against Duff & Phelps for enabling a massive fraud orchestrated by Brendan Ross ("Ross") through a $789 million private investment fund structure managed by Direct Lending Investments, LLC ("DLI").

2.      Plaintiffs, and members of the putative class, collectively invested more than $100 million as limited partners in DLI's feeder funds, which were formed by Ross to invest primarily in online lending marketplaces.  Plaintiffs suffered devastating losses when DLI collapsed in 2019.

3.      Duff & Phelps had actual knowledge of Ross and DLI's fraud.  Shortly after being engaged in 2016, Duff & Phelps circulated a draft valuation report to DLI that reported $14.5 million in defaults by one of DLI's investments, QuarterSpot, Inc. ("QuarterSpot").  When DLI objected, Duff & Phelps adopted DLI's farfetched and implausible explanation for why its original valuation of QuarterSpot was wrong.  Duff & Phelps revised its valuation to match DLI's, and remarked internally that DLI should "be pretty happy with that change."

4.     Duff & Phelps subsequently became aware of, and helped DLI respond to, a lengthy SEC investigation into DLI that culminated in the issuance of an SEC deficiency letter in July 2018.  The SEC letter identified numerous deficiencies, including misleading statements relating to DLI's investment in Dealstruck Funding 3, LLC ("Dealstruck"), an asset that Duff & Phelps valued, as well as misleading statements about loan losses, asset composition, conflicts of interest, fee sharing and compliance.  Despite learning about DLI's misleading practices over the course of helping DLI with its response to the SEC, Duff & Phelps never altered or amended its valuations.

5.     In addition, Duff & Phelps witnessed scores of glaring red flags that it never addressed in its valuations.  Duff & Phelps' conscious disregard of these red flags further evinces its actual knowledge of DLI's fraud.  For example, Duff & Phelps saw that one of DLI's largest assets, VoIP Guardian ("VoIP"), had a $21 million receivable in 2017.  Yet rather than include this in its valuations, Duff & Phelps adopted a "zero loss assumption" — it assumed that DLI's loan portfolio would incur no losses.  Duff & Phelps also saw that DLI allowed a company in which DLI had another large investment, Investment M, to borrow money directly from DLI to cure its default, essentially masking that default.  Duff & Phelps saw that another investment, Investment TS, was not servicing its interest payments, with DLI allowing it to simply add that interest onto outstanding principal.  Duff also saw the capitalization of interest with other investments, such as Investments O, H and I, and agreements by DLI to withhold seeking cash returns on those investments.  Duff & Phelps consciously disregarded these fundamental issues, thereby engineering numbers that comported with DLI's internal valuations.

6.     In this way, with knowledge of DLI's fraud and of DLI's fiduciary duties to its limited partners (the Plaintiffs in this case), Duff & Phelps substantially assisted DLI.  Duff & Phelps deviated from its normal practices, procedures, and valuation methodologies — all in

contravention of industry standards — to ensure that the asset valuations supporting DLI's fraud remained in place.  It accepted DLI's zero-loss assumption and the forecasting of cash flows at a single loss rate.  It accepted DLI's machinations for obscuring investments in default.  It provided DLI with its valuation reports in draft form — inviting and incorporating DLI's changes to the final report.  And it lent its name, credibility, and the imprimatur of legitimacy to DLI and Ross.

7.    To existing and prospective investors, Duff & Phelps' involvement projected stability and confidence, and corroborated DLI's purported steady, positive returns.  But from the outset of its engagement through January 2019, Duff & Phelps significantly overvalued DLI's investments to match DLI's own internal valuations, despite having contradictory information in its possession.

8.    At the very least, Duff & Phelps was negligent with its valuations, which Duff & Phelps knew DLI was touting and disseminating to investors and their representatives.  Duff & Phelps misrepresented that it calculated the "fair value" of DLI's investments pursuant to ASC § 820; that it verified the structure and logic of each valuation model; that it analyzed all assumptions to ensure an adequate representation of risks; that it analyzed assumptions in light of the investments' actual performance, as well as potential risks; and that generally it had developed an appropriate valuation approach.  None of this was true.  Duff & Phelps also omitted scores of material information it learned over the course of servicing DLI.

9.    Duff & Phelps' actions and inactions caused Plaintiffs' losses.  Both before and throughout their investments, Plaintiffs, their agents and/or their registered investment advisors ("RIAs") performed comprehensive due diligence regarding the value of Plaintiffs' investments.  They received, reviewed, and relied upon monthly and quarterly investor reports containing Duff & Phelps' valuations.  Had Plaintiffs known what Duff & Phelps knew and failed to disclose or

account for, Plaintiffs would never have initiated their investments in the Funds, and/or would have withdrawn their investments in the Funds.

10.    On March 22, 2019, the Securities and Exchange Commission ("SEC") brought an action in the U.S. District Court for the Central District of California alleging that DLI's principal had fraudulently overvalued the funds' assets to induce investments and extract excess management and performance fees.  *See SEC v. Direct Lending Invs., LLC*, No. 2:19-cv-2188 (C.D. Cal.) (Fischer, J.) (the "SEC Action").  The Funds are now being liquidated by a court-appointed receiver (the "Receiver") who reports that upward of 70% of the capital invested has been lost.  Through these proceedings, it has become apparent that Duff & Phelps' valuation reports were based on improper and inadequate valuation techniques, were misleading, and materially overstated the value of the funds' assets.  According to the Receiver's estimate, DLI's net asset value as of November 2018 was overstated by at least $459.4 million, with Duff & Phelps' valuation support.

11.    On November 13, 2020, the Receiver issued a detailed report regarding his investigation (the "Receiver's Report") wherein it is stated, *inter alia*, that:  (i) investors will suffer cash losses totaling $250.7 million as of March 31, 2019 based on the shortfall between the amount of net invested capital and the estimated future distributions to investors; (ii) there was an aggregate underreported allowance for doubtful accounts and bad debt expense of $501.4 million relative to the obligations of loan counterparties as of March 31, 2019; (iii) of the $1.7 billion in funding for loans to counterparties, only $465.2 million has been repaid in full, with interest, as of July 31, 2020; (iv) the accounting records and account statements delivered to investors did not reflect appropriate reserves for uncollectable assets and included inflated "mark-ups" relative to appropriate asset valuations, both of which resulted in a misrepresentation of income, value of

assets and net worth as well as overstated net asset values ("NAVs"); (v) that as of November 2019, the Funds' NAV was materially overstated by $465.7 million; (vi) the Funds were in essence a Ponzi scheme perpetrated by Ross and several others; and (vii) that "third party professional service advisors and individuals were substantial factors contributing to, or directly, causing losses" to the Funds.  *SEC* Action ECF No. 320.

12.    As alleged herein, between at least 2016 and January 2019, Duff & Phelps:  (i) aided and abetted the fraud described herein perpetrated on Plaintiffs, intentionally overvaluing the Funds; (ii) aided and abetted in breaches of fiduciary duties owed to Plaintiffs by Ross, DLI, and others; (iii) negligently misrepresented the due diligence performed on DLI's investments, the material risks, and true value of the investments (and aided and abetted in the like negligent misrepresentations of Ross and others).

13.    Plaintiffs relied on Duff & Phelps's independent valuations for assurance that DLI's assets were fairly valued.  Through the purportedly independent valuation confirmations, Duff & Phelps knowingly, recklessly, and/or negligently provided substantial assistance in the massive Ponzi scheme, causing substantial damages to Plaintiffs and the Class.  Had Plaintiffs known the truth, they would not have invested, made additional investments, or maintained their investments in the Funds.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, Title 28, United States Code, Section 1332(d), because (i) the matter in controversy exceeds $5 million, exclusive of interest and costs; (ii) there are members of the proposed Class who are citizens of different states than Defendant; and (iii) there are in the aggregate more than 100 members of the proposed class.

15.    Venue is proper in the Southern District of New York under 28 U.S.C. §1391(b)(2) because Defendant resides in this district.

16.    This Court has personal jurisdiction over Duff & Phelps because Duff & Phelps has its principal place of business in New York.

## PARTIES

### Defendants

17.    Duff & Phelps is a Delaware limited liability company headquartered in New York, New York.  Duff & Phelps is a global advisory firm focusing on valuations, corporate finance, investigations, disputes, cyber security, compliance and regulatory matters, and other governance-related issues.

18.    The true names and capacities of the Does 1 through 20, whether individual, corporate, associate or otherwise, are unknown to Plaintiffs at the time of filing this Complaint. Plaintiffs therefore sue said defendants by such fictitious names and will ask leave of court to amend this Complaint to show their true names or capacities when the same have been ascertained. Plaintiffs are informed and believe, and therefore allege, that each of the Doe defendants is, in some manner, responsible for the events and happenings alleged herein and proximately caused injury and damages to Plaintiffs as herein alleged.

19.    Plaintiffs are informed and believe, and on that basis allege, that each defendant named in this action, including each of the Doe defendants, was the agent, ostensible agent, servant, aider and abettor, co-conspirator, partner, joint venturer, representative and/or associate of each of the other defendants, and was at all times relevant herein acting within the course and scope of his, her or its authority as agent, ostensible agent, servant, aider and abettor, co-

conspirator, partner, joint venturer, representative and/or associate, and with the knowledge, authorization, consent, permission and/or ratification of the other defendants.

20.     On information and belief, all actions of each defendant alleged herein were ratified and approved by the officers and/or managing agents of each other defendant, whether Doe or otherwise.  The conduct, acts and omissions of Defendants, and each of them, as described herein, were undertaken by their officers, directors, or managing agents, identified as Does 1-10.  The conduct of these officers, directors or managing agents was therefore undertaken on behalf of Duff & Phelps.  Further, Defendants and each of them had advance knowledge of the actions and conduct of those individuals, whose actions and conduct were ratified, authorized, and approved by managing agents and by other officers, directors or managing agents whose precise identities are unknown to Plaintiffs at this time.  Plaintiffs thus identify and designate those individuals as Does 5-15.

### **Plaintiffs**

21.     Plaintiff Andrew J. Baer Trust is a Maryland revocable trust formed on December 20, 2017.  Plaintiff Andrew J. Baer ("Baer") is the sole trustee of the Andrew J. Baer Trust.  During the relevant period, Baer, individually and as trustee of the Andrew J. Baer Trust, was a Limited Partner in the Domestic Fund.

22.     Plaintiff Michael Rosenbloom Revocable Trust (the "Rosenbloom Trust") is a Florida revocable trust formed on May 23, 2000.  Plaintiff Michael Rosenbloom ("Rosenbloom") and Robyn Rosenbloom are the trustees for the Rosenbloom Trust.  During the relevant period, Rosenbloom, individually through his Roth IRA, and as trustee of the Rosenbloom Trust, was a Limited Partner in the Domestic Fund.

23.     Plaintiff Wing Point Investments LLC is a Washington limited liability company. John Bierly is the President and Manager of Wing Point Investments LLC.  During the relevant period, Wing Point Investments LLC was a Limited Partner in the Domestic Fund.

24.     Plaintiffs Eytan Turjeman and Naamith Heiblum, husband and wife, (together, the "Turjemans") are individuals residing in Eugene, Oregon.  During the relevant period, the Turjemans were Limited Partners in the Domestic Fund.

25.     Plaintiffs Mordehai and Rachel Heiblum (the "Heiblums"), husband and wife, reside in Rehovot, Israel.  During the relevant period, the Heiblums, individually and through an IRA, were Limited Partners in the Domestic Fund.

26.     Plaintiff Yehudith (Judy) Heiblum ("Y. Heiblum") is an individual residing in Rehovot, Israel.  During the relevant period, Y. Heiblum was a Limited Partner in the Domestic Fund.

27.     Plaintiff Zohar Heiblum ("Z. Heiblum") is an individual residing in Savyon, Israel. During the relevant period, Z. Heiblum was a Limited Partner in the Domestic Fund.

28.     Plaintiff Reuven Heiblum ("R. Heiblum") is an individual residing in Rehovot, Israel.  During the relevant period, R. Heiblum was a Limited Partner in the Domestic Fund.

29.     Plaintiff Greg Isaacs ("Isaacs") is an individual residing in Sherman Oaks, California.  During the relevant period, Isaacs was a Limited Partner in the Domestic Fund.

30.     Plaintiff Bernard E. Francois ("Francois"), a resident of Arizona, is sole trustee of the Bernard E. Francois Living Trust (the "Francois Trust") formed on April 15, 2002.  During the relevant period, the Francois Trust was a Limited Partner in the Domestic Fund.

31.     Plaintiffs Seth Rosenberg ("Rosenberg") and Deborah Loughman ("Loughman"), husband and wife, are individuals residing in Downers Grove, Illinois.  During the relevant period,

Rosenberg and Loughman, individually and through an IRA, were Limited Partners in the Domestic Fund.

32.     Plaintiff John Miller ("Miller") is an individual residing in Corte Madera, California. Miller and Diana Miller are trustees of the Miller Trust formed on August 15, 2001. During the relevant period, Miller, individually, through an IRA, and as trustee of the Miller Trust, was a Limited Partner in the Domestic Fund.

33.     Plaintiff Sierra Springs Diversified Income Fund, LP ("Sierra Springs") is a Maryland limited partnership. Douglas Zinke ("Zinke"), an individual residing in Ashton, Maryland, is the Manager and General Partner of Sierra Springs. During the relevant period, Sierra Springs was a Limited Partner in the Domestic Fund.

34.     Plaintiff Atkins Investment Partnership ("Atkins") is an Illinois partnership located in Glencoe, Illinois. Atkins purchased securities from and/or invested in DLIF in the amount of $500,000 on August 1, 2015, and did not redeem that investment.

35.     Plaintiff Edward Atkins, a resident of Glencoe, Illinois, is the trustee of the Edward M. Atkins Trust ("Atkins Trust"). Atkins Trust purchased securities from and/or invested in DLIF in the amount of $300,000 on March 1, 2016, and did not redeem that investment.

36.     Plaintiff Vernon James Armour, a resident of Chicago, Illinois, is the trustee of the Vernon James Armour Trust dated 04/04/1988 and the Vernon James Armour Trust dated 08/14/2018 (collectively, the "Armour Trust"). The Armour Trust purchased securities from and/or invested in DLIF in the amount of $200,000 on January 1, 2016, and redeemed $20,000 on December 31, 2017.

37.    Plaintiff Ronald Berman, a resident of Phoenix, Arizona, is the trustee of the Ronald Berman Revocable Trust ("Berman Trust"). The Berman Trust purchased securities from and/or invested in DLIF in the amount of $500,000 on March 1, 2018, and did not redeem that investment.

38.    Plaintiff Elizabeth Blinderman ("Blinderman") is an individual who resides in Chicago, Illinois. Blinderman purchased securities from and/or invested in DLIF in the amount of $200,000 on April 1, 2015 and $147,000 April 1, 2016, and did not redeem any portion of that investment.

39.    Plaintiff Paul Blinderman, a resident of West Hollywood, California, is the trustee of the Paul Blinderman Revocable Trust ("Blinderman Trust"). Blinderman Trust purchased securities from and/or invested in DLIF in the amount of $200,000 on November 1, 2015, and redeemed $100,000 on March 31, 2018.

40.    Plaintiff Joseph M. Boniecki ("Boniecki") is an individual who resides in Chicago, Illinois. Boniecki purchased securities from and/or invested in DLIF in the amount of $100,000 on January 1, 2016, and did not redeem that investment.

41.    Plaintiff Patricia Booth, a resident of Chicago, Illinois, is the trustee of the Patricia Booth Revocable Trust ("Booth Trust"). The Booth Trust purchased securities from and/or invested in DLIF in the amount of $250,000 on March 1, 2015 and $150,000 on August 1, 2015, and did not redeem any portion of that investment.

42.    Plaintiff Patricia Booth, a resident of Chicago, Illinois, is the trustee of the Laurence O. Booth Irrevocable Family Trust of 2012 ("Booth Family Trust"). The Booth Family Trust purchased securities from and/or invested in DLIF in the amount of $160,000 on April 1, 2016, and did not redeem that investment.

43.     Plaintiff Anne Burke ("A. Burke") is an individual who resides in Houston, Texas. A. Burke purchased securities from and/or invested in DLIF in the amount of $100,000 on April 1, 2015, and $30,000 on January 1, 2016, and did not redeem any portion that investment.

44.     Plaintiff John Burke ("J. Burke") is an individual who resides in Houston, Texas. J. Burke purchased securities from DLIF in the amount of $100,000 on April 1, 2015 and $60,000 on January 1, 2016, and did not redeem any portion of that investment.

45.     Plaintiff Christopher John Burke ("C. Burke") is an individual who resides in Lake Forest, Illinois.  C. Burke purchased securities from and/or invested in DLIF in the amount of $140,000 on January 1, 2016, and did not redeem that investment.

46.     Plaintiff Francis Campise ("Campise") is an individual who resides in Chicago, Illinois.  Campise purchased securities from and/or invested in DLIF in the amount of $261,000 on March 1, 2016, and did not redeem that investment.

47.     Plaintiff Joseph Campolo, Jr. ("Campolo") is an individual who resides in Winnetka, Illinois. Campolo purchased securities from and/or invested in DLIF in the amount of $500,000 on November 1, 2016, and did not redeem that investment.

48.     Plaintiff Joseph Campolo, Jr. is also the trustee of the Joseph P Campolo Jr. Revocable Trust ("Campolo Trust"). The Campolo Trust purchased securities from and/or invested in DLIF with in the amount of $500,000 on October 1, 2016, and did not redeem that investment.

49.     Plaintiff Joseph S. Chasen ("Chasen") is an individual who resides in Glenview, Illinois. Chasen purchased securities from and/or invested in DLIF in the amount of $200,000 on July 1, 2016 and $254,000 on April 1, 2017, and did not redeem any portion of that investment.

50.     Plaintiff Mari Christopherson, a resident of Chicago, Illinois, is the trustee of the Mari Louisa Christopherson Trust ("Christopherson Trust"). The Christopherson Trust purchased

securities from and/or invested in DLIF in the amount of $250,000 on June 1, 2015, $175,000 on October 1, 2015 and $75,000 on March 1, 2016 and redeemed $300,000 on June 30, 2017.

51.    Plaintiffs Amy Chuckrow and Jonathan Stulgis, both residents of Charlestown, Massachusetts, are the trustees of the Trust Under the Will of Robert Chuckrow Deceased ("Amy Chuckrow Trust"). Plaintiff Sherwood Guernsey, a resident of Williamstown, Massachusetts, is the trustee of the Carol C. Guernsey Irrevocable Trust, which received the assets of the Carol Guernsey Trust Under the Will of Robert Chuckrow after Mrs. Guernsey passed (collectively, the "Guernsey Trust"). The Amy Chuckrow and Guernsey Trusts are the beneficial owners of funds initially invested by The Robert Chuckrow Trust in DLIF. The Chuckrow Trust purchased securities from and/or invested in DLIF in the amount of $350,000 on June 1, 2015 and $160,000 on August 1, 2015, and did not redeem any portion of that investment.

52.    Plaintiff Phillip Crump ("Crump") is an individual who resides in Douglas, Michigan. Crump purchased securities from and/or invested in DLIF in the amount of $100,000 on June 1, 2015, $70,000 on January 1, 2016 and $52,000 on November 1, 2018, and did not redeem any portion of that investment.

53.    Plaintiff David Decker, Sr. ("D.A. Decker") is an individual who resides in Longboat Key, Florida. D.A. Decker purchased securities from and/or invested in DLIF in the amount of $500,000 on March 1, 2015, and redeemed $150,000 on November 30, 2016.

54.    Plaintiff David Decker, Sr. is also the trustee for the Mary Louise Decker Family GST Trust ("Decker Family Trust"). The Decker Family Trust purchased securities from and/or invested in DLIF in the amount of $250,000 on July 1, 2017 and $100,000 on February 1, 2018, and redeemed $75,000 on July 31, 2017.

55.     Plaintiff David Decker, Jr., a resident of Sarasota, Florida, is the trustee of the 2017 Decker Family Irrevocable Gift Trust ("2017 Decker Trust"). The 2017 Decker Trust purchased securities from and/or invested in DLIF in the amount of $250,000 on May 1, 2018, and did not redeem that investment.

56.     Plaintiff 2012 DPDS Fund L.P. ("DPDS Fund") is an Illinois limited partnership. DPDS Fund purchased securities from and/or invested in DLIF in the amount of $700,000 on April 1, 2017, and did not redeem that investment.

57.     Plaintiff Barbara Drumm ("Drumm") is an individual who resides in Valparaiso, Indiana. Drumm purchased securities from and/or invested in DLIF with in the amount of $150,000 on April 1, 2015 and $82,000 on June 1, 2016, and did not redeem any portion of that investment.

58.     Plaintiff Dusty47 LLC ("Dusty47") is a Delaware limited liability company. Dusty47 purchased securities from and/or invested in DLIF in the amount of $513,735 on January 1, 2016, and did not redeem that investment.

59.     Plaintiff Four J Family LLC ("Four J") is a Delaware limited liability company. Four J purchased securities from and/or invested in DLIF in the amount of $4,032,739 on December 1, 2017, and did not redeem that investment.

60.     Plaintiff Jeffrey Goldberg, a resident of Union Pier, Michigan, is the trustee of the Jeffrey M. Goldberg Trust u/a dtd 08/01/1995 ("Goldberg Trust"). The Goldberg Trust purchased securities from and/or invested in DLIF in the amount of $250,000 on May 1, 2017, and did not redeem that investment.

61.    Plaintiff Harmony Investments LLC ("Harmony") is a Michigan limited liability company.  Harmony purchased securities from and/or invested in DLIF in the amount of $2,000,000 on May 1, 2016, and did not redeem that investment.

62.    Plaintiff Charles Harrold, III ("C. Harrold") is an individual who resides in Palm Beach Gardens, Florida.  C. Harrold purchased securities from and/or invested in DLIF in the amount of $475,000 on January 1, 2015, $300,000 on March 1, 2016 and $500,000 on June 1, 2016, and redeemed $500,000 on December 31, 2017 and $600,000 on June 30, 2018.

63.    Plaintiff Margaux Marbury Harrold ("M. Harrold") is an individual who resides in Palm Beach Gardens, Florida. M. Harrold purchased securities from and/or invested in DLIF in the amount of $100,000 on May 1, 2015 and $100,000 on June 1, 2015, and redeemed $100,000 on December 31, 2017.

64.    Plaintiff Stephanie Harrold, a resident of Palm Beach Gardens, Florida, is the trustee of the Stephanie A. Harrold Revocable Trust ("Harrold Trust"). The Harrold Trust purchased securities from and/or invested in DLIF in the amount of $200,000 on January 1, 2015, $100,000 on April 1, 2015, $250,000 May 1, 2015 and $75,000 on August 1, 2015, and redeemed $90,000 on February 28, 2017, and $300,000 on December 31, 2017.

65.    Plaintiff Nancy Lynn Morton, a resident of Chicago, Illinois, is the trustee of the Harrold Family Dynasty Trust ("Harrold Family Dynasty Trust"). The Harrold Family Dynasty Trust purchased securities from and/or invested in DLIF in the amount of $300,000 on April 1, 2015, $500,000 on May 1, 2015 and $500,000 on August 1, 2015, and did not redeem any portion of that investment.

66.    Plaintiff Charles Cotton Harrold IV, a resident of Palm Beach Gardens, Florida, is the trustee of the C. Cotton Harrold IV Investment Trust ("Harrold Investment Trust"). The

Harrold Investment Trust purchased securities from and/or invested in DLIF in the amount of $100,000 on June 1, 2015 and $100,000 on October 1, 2015, and redeemed $100,000 on December 31, 2017.

67.    Plaintiff JP Morgan Trust Company of Delaware is the trustee of the Trust Under the Will of Marion E. Horween FBO Nancy Horween Trust ("N. Horween Trust"). The N. Horween Trust purchased securities from and/or invested in DLIF in the amount of $525,000 on May 1, 2018, and did not redeem that investment.

68.    Plaintiff JP Morgan Trust Company of Delaware is the trustee of the Trust Under the Will of Marion E. Horween FBO Lisa Horween Kelly ("L. Horween Trust"). The L. Horween Trust purchased securities from and/or invested in DLIF in the amount of $600,000 on May 1, 2018, and did not redeem that investment.

69.    Plaintiff Sally Jo Morris, a resident of Chicago, Illinois, is the trustee of the Suzanne Kanis Revocable Trust ("Kanis Trust"). The Kanis Trust purchased securities from and/or invested in DLIF in the amount of $1,500,000 on February 1, 2015, and did not redeem that investment.

70.    Plaintiff Ronald D. Kaplan ("Kaplan") is an individual who resides in Studio City, California.  Kaplan purchased securities from and/or invested in DLIF in the amount of $75,000 on January 1, 2016 and $13,000 on April 1, 2016, and did not redeem any portion of that investment.

71.    Plaintiff Michael R. Kaskie ("Kaskie") is an individual who resides in Chicago, Illinois.  Kaskie purchased securities from and/or invested in DLIF in the amount of $136,000 on July 1, 2016, and did not redeem that investment.

72.    Plaintiff Kilrea Family Investments, LLC ("Kilrea Investments") is an Illinois limited liability company. Kilrea Investments purchased securities from and/or invested in DLIF

in the amount of $350,000 on February 1, 2015 and $197,000 on August 1, 2015, and did not redeem any portion of that investment.

73.     Plaintiff Scott Kilrea, a resident of Hilton Head Island, South Carolina, is the trustee of the Scott Kilrea Trust U/A DTD 04/14/1997 ("Kilrea Trust"). The Kilrea Trust purchased securities from and/or invested in DLIF in the amount of $1,000,000 on January 1, 2015, and did not redeem that investment.

74.     Plaintiff Karl John Henry Koehler III ("K. Koehler") is an individual who resides in New York, New York. K. Koehler purchased securities from and/or invested in DLIF in the amount of $240,000 on January 1, 2015, and redeemed $50,000 on December 31, 2017.

75.     Plaintiff Sandra Sue Koehler ("S. Koehler") is an individual who resides in New York, New York. S. Koehler purchased securities from and/or invested in DLIF in the amount of $120,000 on February 1, 2015, and did not redeem that investment.

76.     Plaintiffs Karl Henry John Koehler III and Inna Koehler, both residents of New York, New York, are the trustees of the Jay Koehler and Inna Koehler Living Trust located (collectively "Koehler Trust"). The Koehler Trust purchased securities from and/or invested in DLIF in the amount of $280,823 on April 1, 2018, and redeemed $1,849.06 on May 31, 2018.

77.     Plaintiff Kreiseder Family LLC ("Kreiseder") is a Delaware limited liability company. Kreiseder purchased securities from and/or invested in DLIF in the amount of $250,000 on March 1, 2017 and $250,000 on March 1, 2018, and did not redeem that investment.

78.     Plaintiff LTR I LLC ("LTR") is a Delaware limited liability company.  LTR purchased securities from and/or invested in DLIF in the amount of $350,000 on June 1, 2018, and did not redeem that investment.

79.     Plaintiff Sheffee Lulkin ("Lulkin") is an individual who resides in Skokie, Illinois. Plaintiff Shefee Lulkin & Associates, Inc. ("Lulkin & Associates") is an Illinois corporation. Lulkin and/or Lulkin & Associates purchased securities from and/or invested in DLIF in the amount of $200,000 on February 1, 2015, and did not redeem that investment.

80.     Plaintiff John L MacCarthy, a resident of Winnetka, Illinois, is the trustee of the John Leland MacCarthy Revocable Trust ("MacCarthy Trust"). MacCarthy Trust purchased securities from and/or invested in DLIF in the amount of $1,000,000 on May 1, 2016, and did not redeem that investment.

81.     Plaintiff John D. Marschall, a resident of Port St. Lucie, Florida, is the trustee of the John D. Marschall Trust ("Marschall Trust"). The Marschall Trust purchased securities from and/or invested in DLIF in the amount of $100,000 on January 1, 2015 and $50,000 on June 1, 2015, and did not redeem any portion of that investment.

82.     Plaintiff Peter J. McDonald, a resident of Lake Bluff, Illinois, is the trustee of the Peter J. McDonald Trust DTD 04/22/2010 ("McDonald Trust"). McDonald purchased securities from and/or invested in DLIF in the amount of $100,000 on June 1, 2016, and did not redeem that investment.

83.     Plaintiff William McKenna ("McKenna") is an individual who resides in Hobe Sound, Florida.  McKenna purchased securities from and/or invested in DLIF in the amount of $300,000 on November 1, 2016, and did not redeem that investment.

84.     Plaintiff Nancy Mengel ("Mengel") is an individual who resides in Novato, California. Mengel purchased securities from and/or invested in DLIF in the amount of $100,000 on April 1, 2015 and $20,000 on January 1, 2016, and did not redeem any portion of that investment.

85.     Plaintiff Robert Mueckler, II ("Mueckler") is an individual who resides in Elgin, South Carolina. Mueckler purchased securities from and/or invested in DLIF in the amount of $264,766 on May 1, 2017, and redeemed $100,000 on July 31, 2017 and $36,000 on October 31, 2018.

86.     Plaintiff Steven Patrick Nedelka ("Nedelka") is an individual who resides in Libertyville, Illinois. Nedelka purchased securities from and/or invested in DLIF in the amount of $100,000 on January 1, 2016, and did not redeem that investment.

87.     Plaintiffs Holly Nelson-Johnson and Terry Nelson-Johnson, both residents of Evanston, Illinois, are the trustees of the E. Holly Nelson-Johnson Family Irrevocable Trust (collectively "Nelson-Johnson Trust"). The Nelson-Johnson Trust purchased securities from and/or invested in DLIF in the amount of $250,000 on June 1, 2015 and $158,000 on March 1, 2016, and did not redeem any portion of that investment.

88.     Plaintiff Mark Ordower, a resident of Chicago, Illinois, is the trustee of the Mark Ordower Trust ("Ordower Trust"). The Ordower Trust purchased securities from and/or invested in DLIF in the amount of $350,000 on December 1, 2016, and did not redeem that investment.

89.     Plaintiff Ordower Investments ("Ordower Investments") is an Illinois partnership with its principal place of business in Chicago, Illinois. Ordower Investments purchased securities from and/or invested in DLIF in the amount of $537,672.34 on January 1, 2016 and did not redeem that investment.

90.     Plaintiff James Papesch ("Papesch") is an individual who resides in Lake Forest, Illinois. Papesch purchased securities from and/or invested in DLIF in the amount of $100,000 on June 1, 2015, and did not redeem that investment.

91.     Plaintiff Peer Pedersen, Jr., a resident of Chicago, Illinois, is the trustee of the Declaration of Trust of Peer Pedersen ("Pedersen DOT"). The Pedersen DOT purchased securities from and/or invested in DLIF in the amount of $250,000 on March 1, 2018, and did not redeem that investment.

92.     Plaintiff John Muehlstein, a resident of Chicago, Illinois, is the trustee of the Peer Pedersen Trust ("Pedersen Trust"). The Pedersen Trust purchased securities from and/or invested in DLIF in the amount of $500,000 on May 1, 2015, $440,000 on September 1, 2015 and $250,000 on March 1, 2016, and redeemed $250,000 on May 31, 2018 and $350,000 on October 31, 2018.

93.     Plaintiff Barry Lance Polonitza ("Polonitza") is an individual who resides in Bonita Springs, Florida. Polonitza purchased securities from and/or invested in DLIF in the amount of $200,000 on June 1, 2015, and redeemed $50,000 on August 31, 2018.

94.     Plaintiff Ruthmarie Connor, a resident of Boulder, Colorado, is the trustee of the Rollin Polonitza Family Trust ("Polonitza Family Trust"). The Polonitza Family Trust purchased securities from and/or invested in DLIF in the amount of $400,000 on March 1, 2016, and did not redeem that investment.

95.     Plaintiff Mary Polonitza, a resident of Carlsbad, California, is the trustee of the Jard Polonitza Separate Property Trust ("Jard Polonitza Trust"). The Jard Polonitza Trust purchased securities from and/or invested in DLIF in the amount of $250,000 on June 1, 2015 and $200,000 on June 1, 2016, and did not redeem any portion of that investment.

96.     Plaintiff Beri Lynn Polonitza, a resident of Boulder, Colorado, is the trustee of the Beri Lynn Polonitza Revocable Trust ("B.L. Polonitza Trust"). The B.L. Polonitza Trust purchased securities from and/or invested in DLIF in the amount of $160,000 on March 1, 2016, and did not redeem that investment.

97.    Plaintiff Phillip Porpora, a resident of Scottsdale, Arizona, is the trustee of the Phillip Porpora Trust ("Porpora Trust"). The Porpora Trust purchased securities from and/or invested in DLIF in the amount of $200,000 on February 1, 2015 and $150,000 on August 1, 2015, and redeemed $65,000 on February 28, 2018.

98.    Plaintiff Liza Reynolds Limited Partnership ("Reynolds") is an Illinois limited partnership.   Reynolds purchased securities from and/or invested in DLIF in the amount of $500,000 on April 1, 2016,and redeemed $105,000 on August 31, 2016.

99.    Plaintiff RJDC Management Company LLC ("RJDC") is an Illinois limited liability company.  RJDC purchased securities from and/or invested in DLIF in the amount of $1,335,481 on January 1, 2018, and did not redeem that investment.

100.    Plaintiff Scott Anthony Ronan ("Ronan") is an individual who resides in Rochester Hills, Michigan.   Ronan purchased securities from and/or invested in DLIF in the amount of $100,000 on January 1, 2017, and did not redeem that investment.

101.    Plaintiff Kimberly Seeds ("Seeds") is an individual who resides in Naples, Florida. Seeds purchased securities from and/or invested in DLIF in the amount of $500,000 on May 1, 2017, and did not redeem that investment.

102.    Plaintiff James Sharman ("Sharman") is an individual who resides in Naples, Florida. Sharman purchased securities from and/or invested in DLIF in the amount of $125,000 on April 1, 2015, $50,000 on January 1, 2016 and $115,000 on March 1, 2016, and did not redeem any portion of that investment.

103.    Plaintiff Victoria Clewell, a resident of Lake in the Hill, Illinois, is the trustee of the Ronald J. Sloane Family Trust, which inherited the assets of an IRA established by Ronald J. Sloane ("Sloane Trust"). Mr. Sloane and/or the Sloane Trust purchased securities from and/or

invested in DLIF in the amount of $150,000 on April 1, 2015 and $40,000 on January 1, 2016, and redeemed $30,000 on October 31, 2017.

104.    Plaintiff SSSB Partnership ("SSSB") is an Illinois partnership.  SSSB purchased securities from and/or invested in DLIF in the amount of $250,000 on September 1, 2016, and did not redeem that investment.

105.    Plaintiff Jonathan Stulgis, a resident of Charlestown, Massachusetts, is the trustee of the Jonathan W. Stulgis Family Trust ("Stulgis Trust"). The Stulgis Trust purchased securities from and/or invested in DLIF in the amount of $250,000 on January 1, 2016, and did not redeem that investment.

106.    Plaintiff Doris J. Wik ("D.J. Wik") is an individual who resides in Farmington Hills, Michigan. D.J. Wik purchased securities from and/or invested in DLIF in the amount of $150,000 on June 1, 2016, and did not redeem that investment.

107.    Plaintiff Frances Armour Williamson, a resident of Charlotte, North Carolina, is the trustee of the Frances Armour Williamson TTEE Revocable Trust of Frances Armour Williamson ("Williamson Trust"). The Williamson Trust purchased securities from and/or invested in DLIF in the amount of $165,000 on January 1, 2018, and did not redeem that investment.

108.    Plaintiff Yiming Zhang ("Zhang") is an individual who resides in Chicago, Illinois. Zhang purchased securities from and/or invested in DLIF in the amount of $500,000 on March 1, 2015, $500,000 on May 1, 2015, $500,000 on October 1, 2015 and $1,750,000 on March 1, 2016, and redeemed $1,000,000 on March 31, 2018.

109.    Plaintiff Stephen Jay Akana ("Akana") is an individual who resides in Berkeley, California. Akana purchased securities from and/or invested in DLIF in the amount of $250,000 on March 1, 2018, and did not redeem that investment.

110.    Plaintiffs Harminder Brar and Pearlene Brar, both residents of Anaheim, California, are the trustees of the Brar Family Trust (collectively "Brar Trust"). The Brar Trust purchased securities from and/or invested in DLIF in the amount of $250,000 on November 1, 2018, and did not redeem that investment.

111.    Plaintiff Robert Brilliant, a resident of San Mateo California, is the trustee of the Brilliant Family Trust ("Brilliant Family Trust"). The Brilliant Family Trust purchased securities from and/or invested in DLIF in the amount of $206,191.78 on July 1, 2017, $100,000 on February 1, 2018 and $50,000 on July 1, 2018, and did not redeem any portion of that investment.

112.    Plaintiff Jerome Yap Chua ("Chua") is an individual who resides in Danville, California. Chua purchased securities from and/or invested in DLIF in the amount of $250,000 on December 1, 2018, and did not redeem that investment.

113.    Plaintiff Orla Cunningham, LLC ("Orla") is a California limited liability company. Orla purchased securities from DLIF in the amount of $250,000 on June 1, 2018, and did not redeem that investment.

114.    Plaintiff Barry P. Garrison, a resident of Madera, California, is the trustee of the Barry P. Garrison ("Garrison Trust"). The Garrison Trust purchased securities from and/or invested in DLIF in the amount of $250,000 on June 1, 2018, and did not redeem that investment.

115.    Plaintiff Eugene Goebel ("E. Goebel") is an individual who resides in Pismo Beach, California. E. Goebel purchased securities from and/or invested in DLIF in the amount of $500,000 on January 1, 2019, and did not redeem that investment.

116.    Plaintiff Jessa Ann Goebel ("J. Goebel") is an individual who resides in El Dorado Hills, California. J. Goebel purchased securities from and/or invested in DLIF in the amount of $250,000 on February 1, 2018, and did not redeem that investment.

117.    Plaintiff Stephanie Marie Grein ("Grein") is an individual who resides in San Francisco, California. Grein purchased securities from and/or invested in DLIF in the amount of $250,000 on February 1, 2018, and did not redeem that investment.

118.    Plaintiffs Brent Horowitz and Heather Thompson, both residents of Corte Madera, California, are the trustees of the Horowitz Family Trust (collectively "Horowitz Trust"). The Horowitz Trust purchased securities from and/or invested in DLIF in the amount of $100,000 on October 1, 2015 and $9,000 on May 1, 2017, and redeemed $20,210 on October 31, 2016.

119.    Plaintiff Julie Lewis ("Lewis") is an individual who resides in Longmont, Colorado. Lewis purchased securities from and/or invested in DLIF in the amount of $250,000 on April 1, 2018, and did not redeem that investment.

120.    Plaintiff Stacy K. Li ("Li") is an individual who resides in Santa Rosa, California. Li purchased securities from and/or invested in DLIF in the amount of $250,000 on February 1, 2018, and did not redeem that investment.

121.    Plaintiff Ronald McLeod, a resident of Pleasanton, California, is the trustee of the Ronald McLeod Revocable Trust ("McLeod Trust"). The McLeod Trust purchased securities from and/or invested in DLIF in the amount of $250,000 on June 1, 2018, and did not redeem that investment.

122.    Plaintiff John D. Michael ("J.D. Michael") is an individual who resides in San Rafael, California. J.D. Michael purchased securities from and/or invested in DLIF in the amount

of $200,000 on July 1, 2015 and $250,000 on November 1, 2015, and did not redeem that investment.

123.    Plaintiff Daniel Michael and Lillian Leong, both residents of Walnut Creek, California, are the trustees of the Michael Leong Family Trust DTD 08/13/2013 ("Michael Trust"). The Michael Leong Family Trust purchased securities from and/or invested in DLIF in the amount of $100,000 on May 1, 2016, and $50,000 on August 1, 2017.

124.    Plaintiff Jennifer Mvongo, a resident of San Diego, California , is the trustee of the Jennifer M. Mvongo Revocable Trust ("Mvongo Trust"). The Mvongo Trust purchased securities from and/or invested in DLIF in the amount of $250,000 on February 1, 2018, and did not redeem that investment.

125.    Plaintiffs Ramesh Patel and Alison Patel, both residents of Mill Valley, California, are the trustees of the R. Patel and A. Patel TTEE, KENEW DBP U/A DTD 12/31/2016 (collectively, the "Patels"). The Patels purchased securities from and/or invested in DLIF in the amount of $250,000 on November 1, 2018, and did not redeem that investment.

126.    Plaintiff David Malcolm Potts ("Potts") is an individual who resides in Berkeley, California. Potts purchased securities from and/or invested in DLIF in the amount of $500,000 on July 1, 2018, and did not redeem that investment.

127.    Plaintiff Thomas F. Reiser, Jr. ("Reiser") is an individual who resides in Alamo, California. Reiser purchased securities from and/or invested in DLIF in the amount of $250,000 on February 1, 2018, and did not redeem that investment.

128.    Plaintiff James E. Salter ("Salter") is an individual who resides in San Ramon, California. Salter purchased securities from and/or invested in DLIF in the amount of $25,000 on

July 1, 2015, $25,000 on April 1, 2016 and $43,000 on May 1, 2017, and did not redeem any portion of that investment.

129.    Plaintiff Ridge Sampson, a resident of Mill Valley, California, is the trustee of the Ridge Sampson Revocable Trust ("Sampson Trust"). The Sampson Trust purchased securities from and/or invested in DLIF in the amount of $250,000 on July 1, 2017, $750,000 on August 1, 2017 and $250,000 on February 1, 2018, and did not redeem any portion of that investment.

130.    Plaintiff Aaron Michael Silva ("Silva") is an individual who resides in Dallas, Texas. Silva purchased securities from and/or invested in DLIF in the amount of $100,000 on July 1, 2015, $100,000 on April 1, 2016, $50,000 on August 1, 2017, and did not redeem any portion of that investment.

131.    Plaintiff Gerald Guy Stokes, Jr. ("Stokes") is an individual who resides in San Mateo, California. Stokes purchased securities from and/or invested in DLIF in the amount of $150,000 on October 1, 2015 and $150,000 on April 1, 2017, and did not redeem any portion of that investment.

132.    Plaintiff Max Luis Tejada ("Tejada") is an individual who resides in Carlsbad, California. Tejeda purchased securities from and/or invested in DLIF in the amount of $114,855.28 on February 1, 2017, and did not redeem that investment.

133.    Plaintiff Trinh-Mai N. Vo ("Vo") is an individual who resides in Dublin, California. Vo purchased securities from and/or invested in DLIF in the amount of $250,000 on November 1, 2018, and did not redeem that investment.

134.    Plaintiff Bret M. Walberg ("Walberg") is an individual who resides in Goodyear, Arizona. Walberg purchased securities from and/or invested in DLIF in the amount of $200,000 on August 1, 2015, and did not redeem that investment.

135.    Plaintiff Michael Witlin ("Witlin") is an individual who resides in Lafayette, California. Witlin purchased securities from and/or invested in DLIF in the amount of $250,000 on March 1, 2017 and $250,000 on March 1, 2018, and did not redeem any portion of that investment.

136.    Plaintiff Bennet Woodward ("Woodward") is an individual who resides in Cardiff by the Sea, California. Woodward purchased securities from and/or invested in DLIF in the amount of $250,000 on February 1, 2018, and did not redeem that investment.

137.    Plaintiff Dimitri Katamanin, individually and as the trustee of the Four Season's Trust purchased securities from and/or invested in DLIF in the amount of $250,000 on March 1, 2016, and did not redeem that investment.

138.    Plaintiff Sameer Kero, a resident of Chicago, Illinois, is the trustee of the Flexedge Investment Management Defined Benefit Pension Plan & Trust ("Flexedge Trust"). The Flexedge Trust purchased securities from and/or invested in DLIF in the amount of $118,266 on January 1, 2017 $91,000 on June 1, 2017, and $149,500 on February 1, 2019, and redeemed $229,643.62 on June 30, 2018.

139.    Plaintiff Sameer Kero ("S. Kero") is an individual who resides in Chicago, Illinois. S. Kero purchased securities from and/or invested in DLIF in the amount of $1,000,000 on February 1, 2014, $1,900,000 on April 1, 2014, $200,000 on August 1, 2015, $439,000 on October 1, 2015 and $300,000 on October 1, 2016, and redeemed $91,000 on February 28, 2018 and $500,000 on October 31, 2018.

140.    Plaintiff Chanda Mehta Kero ("C. Kero") is an individual who resides in Chicago, Illinois. C. Kero purchased securities from and/or invested in DLIF in the amount of $100,000 on October 1, 2016 and $100,000 on June 1, 2018, and did not redeem any portion of that investment.

141.    N. Kero Investments, LTD., LLLP ("Kero Investments") is an Illinois limited liability limited partnership with its principal place of business in Chicago, Illinois. Kero Investments purchased securities from and/or invested in DLIF in the amount of $400,000 on October 1, 2013, $200,000 on November 1, 2013, $1,100,000 on May 1, 2014, $650,000 on June 1, 2014, $1,650,000 on July 1, 2014, $1,400,000 on August 1, 2015 and $200,000 on October 1, 2016, and redeemed $200,000 on May 31, 2017 and $500,000 on October 31, 2018.

142.    Plaintiff S. Kero Limited Partnership ("Kero LP") is a Florida limited partnership with its principal place of business in Brooksville, Florida.  Kero LP purchased securities from and/or invested in DLIF in the amount of $1,250,000 on February 1, 2014, $1,250,000 on March 1, 2014, $1,000,000 on August 1, 2014, $1,000,000 on September 1, 2014, $700,000 on December 1, 2014, $600,000 on February 1, 2015, $700,000 on August 1, 2015, and $561,000 on October 1, 2015, and redeemed $500,000 on April 30, 2017.

143.    Plaintiff Niloufer Kero ("Niloufer Kero") is an individual who resides in Springhill, Florida. Niloufer Kero purchased securities from and/or invested in DLIF in the amount of $200,000 on September 1, 2013, $330,000 on October 1, 2013 and $110,000 on May 1, 2014, and did not redeem any portion of that investment.

144.    Plaintiff Niloufer Kero, a resident of Springhill, Florida, is the trustee of Niloufer Kero Revocable Family Trust ("Niloufer Kero Trust"). The Niloufer Kero Trust purchased securities from and/or invested in DLIF in the amount of $400,000 on October 1, 2013, $100,000 on May 1, 2014, $1,000,000 on July 1, 2014, $500,000 on September 1, 2014, $500,000 on February 1, 2015 and $430,000 on August 1, 2015, and redeemed $500,000 on January 31, 2016, $100,000 on May 31, 2016, $500,000 on April 30, 2017 and $500,000 on October 31, 2018.

145.    Plaintiff Shawkat Kero ("Shawkat Kero") is an individual who resides in Jersey City, NJ.  Shawkat Kero purchased securities from and/or invested in DLIF in the amount of $850,000 on December 1, 2013 and $700,000 on January 1, 2015, and did not redeem any portion of that investment.

146.    Plaintiff Sarita Mehta ("Mehta") is an individual who resides in Chicago, Illinois. Mehta purchased securities from and/or invested in DLIF in the amount of $65,000 on February 1, 2017 and $34,000 on June 1, 2017, and did not redeem any portion of that investment.

147.    Plaintiff Narendrakumar & Smita Mehta Joint ("N&S Mehta") are individuals who reside in Hoffman Estates, Illinois. N&S Mehta purchased securities from and/or invested in DLIF in the amount of $210,000 on August 1, 2015, $60,000 on March 1, 2016, $30,000 on August 1, 2016, $15,000 on September 1, 2016, $35,000 on February 1, 2017, $25,000 on May 1, 2018 and $145,000 on October 1, 2018, and redeemed $35,000 on July 31, 2018.

148.    Plaintiff Pareshkumar Desai ("Pareshkumar Desai") in an individual who resides in Crystal River, Florida. Pareshkumar Desai purchased securities from and/or invested in DLIF in the amount of $1,000,000 on January 1, 2014, and did not redeem that investment.

149.    Plaintiffs Etienne Boillot, a resident of Mamaroneck, New York, and Stuart E. Lucas, a resident of Chicago, Illinois, are the trustees of the GST Trust.  GST Trust purchased securities from and/or invested in DLIF in the amount of $300,000 on January 1, 2017, and did not redeem that investment.

150.    Plaintiff Anthony V. Dub ("Dub") is an individual who resides in New York, New York.  Dub purchased securities from and/or invested in DLIF in the amount of $500,000 on September 1, 2014, $250,000 on December 1, 2014, $250,000 on April 1, 2016, $250,000 on

September 1, 2016, $250,000 on July 1, 2017 and $250,000 on January 1, 2018, and did not redeem that investment.

151.    Plaintiff Michael Driscoll ("M. Driscoll") is an individual who resides in Louisville, Kentucky.  M. Driscoll purchased securities from and/or invested in DLIF in the amount of $100,000 on January 1, 2016, and did not redeem that investment.

152.    Plaintiffs Neal Driscoll and Alia Driscoll (the "Driscolls") are individuals who reside in Bozeman, Montana.  The Driscolls purchased securities from and/or invested in the amount of $112,987 on June 1, 2017, and did not redeem that investment.

153.    Plaintiff Dennis J. FitzSimons ("FitzSimons") is an individual who resides in Naples, Florida. FitzSimons purchased securities from and/or invested in DLIF in the amount of $500,000 on May 1, 2017, and did not redeem that investment.

154.    Plaintiffs U.S. Bank N.A., a national association incorporated in Delaware, and Soyla V. Rausch are the trustee for the Carrie G. Cox TUW Tr. B FBO Mary Hancock ("First Hancock Trust").  The First Hancock Trust purchased securities from and/or invested in DLIF in the amount of $300,00 on August 1, 2015, and did not redeem that investment.

155.    Plaintiffs U.S. Bank N.A., a national association incorporated in Delaware, and Soyla V. Rausch are the trustee for the Harriet C. Collis TUA Tr. B FBO Mary Hancock ("Second Hancock Trust"), is domiciled in Naples, Florida.  The Second Hancock Trust purchased securities from and/or invested in DLIF in the amount of $200,000 on August 1, 2015, and did not redeem that investment.

156.    Plaintiff, William Wayne Hancock III, a resident of Louisville, Kentucky, is the trustee of the George B. Hancock Trust ("G.B. Hancock Trust"). The G.B. Hancock Trust

purchased securities from and/or invested in DLIF in the amount of $100,000 on October 1, 2016, and did not redeem that investment.

157.    Plaintiffs John Vance Hancock and Nancy A.D. Hancock (the "Hancocks") are individuals who reside in Easton, Connecticut. The Hancocks purchased securities from and/or invested in DLIF in the amount of $100,000 on October 1, 2015, and did not redeem that investment.

158.    Plaintiff Michael Harrigan ("Harrigan") is an individual who resides in Tequesta, Florida. Harrigan purchased securities from and/or invested in DLIF in the amount of $200,000 on June 1, 2015, and did not redeem that investment.

159.    Plaintiff Michael Harrigan, a resident of Tequesta, Florida, is the trustee for the Michael J. Harrigan Trust ("Harrigan Trust"). The Harrigan Trust purchased securities from and/or invested in DLIF in the amount of $200,000 on June 1, 2015, and did not redeem that amount.

160.    Plaintiff John H. Heuberger, a resident of Westminster, Colorado, is the trustee of the WBK 2012 Trust ("WBK Trust"). The WBK Trust purchased securities from and/or invested in DLIF in the amount of $1,000,000 on October 1, 2014, and did not redeem that amount.

161.    Plaintiff Loeb Holding Corporation ("Loeb") is a New York corporation with its principal place of business in New York, New York.  Loeb purchased securities from and/or invested in DLIF in the amount of $1,000,000 of June 1, 2015, and did not redeem that amount.

162.    Plaintiff Armando Pauker ("Pauker") is an individual who resides in Glenview, Illinois. Pauker purchased securities from and/or invested in DLIF in the amount of $733,146.71 on April 1, 2016 and $22,000 on June 1, 2016, and did not redeem that amount.

163.    Plaintiff Pauker & Mary Helen Henske ("Henske") are individuals who reside in Glenview, Illinois. Pauker and Henske purchased securities from and/or invested in DLIF in the

amount of $100,000 on February 1, 2015, $100,000 on January 1, 2016, and $500,000 on January 1, 2018, and did not redeem that amount.

164.    Plaintiff SAS ARDIS ("SAS ARDIS") is a foreign holding company, in which David Spector invested. SAS ARDIS purchased securities from and/or invested in DLIF in the amount of $800,000 on July 1, 2018 and $399,970 on October 1, 2018, and did not redeem that amount.

165.    Plaintiff Vasundhara Tolia ("V. Tolia") is an individual who resides in Bloomfield Hills, Michigan.  V. Tolia purchased securities from and/or invested in DLIF in the amount of $265,000 on January 1, 2015, $300,000 on June 1, 2015 and $367,000 on May 1, 2016, and redeemed $400,000 on January 31, 2018.

166.    Plaintiff Osman Uslu ("Uslu") is competent adult.  Uslu purchased securities from and/or invested in DLIF and/or DLIFF in the amount of $500,000 on June 1, 2015, $500,000 on February 1, 2017, and $1,000,000 on June 1, 2018, and redeemed $42,083.92 on March 31, 2016.

167.    Plaintiff Bret M. Walberg ("Walberg") is an individual who resides in Goodyear, Arizona.  Walberg purchased securities from and/or invested in DLIF in the amount of $200,000 on August 1, 2015, and did not redeem that amount.

168.    Plaintiff Shai Wininger a.k.a. Shay Wininger ("Wininger") is an individual who resides in Haifa, Israel. Wininger purchased securities from and/or invested in DLIF and/or DLIFF in the amount of $100,000 on May 1, 2015, $150,000 on June 1, 2015, $500,000 on July 1, 2015, and $250,000 on April 1, 2017, and did not redeem any portion of that investment.

169.    Plaintiffs Philip Nadel and Blair Ambach ("Nadel/Ambach") are individuals who reside in Boca Raton, Florida, and Plaintiff Chancellor Capital is a Florida limited liability company (collectively, "Nadel/Ambach/Chancellor").  Nadel/Ambach/Chancellor purchased

securities from and/or invested in DLIF in the amount of $125,000 on August 1, 2013, $125,000 on September 1, 2013, $125,000 on October 1, 2013, $125,000 on November 1, 2013, $500,000 on December 1, 2013, $250,000 on April 1, 2014, $250,000 on December 1, 2014, and $250,000 on February 1, 2015. These amounts were never redeemed. The full amounts plus growth from reported net income, minus management and performance fees, were transferred from Chancellor Capital, LLC to Nadel/Ambach on September 1, 2018, and totaled $2,912,520. Nadel/Ambach never redeemed their investment.

170.    Plaintiff John W. Buttrick ("Buttrick") is an individual who resides in New York City, New York. Buttrick purchased securities from and/or invested in DLIF in the amount of $500,000 on October 1, 2015 and $250,000 on November 1, 2015, and did not redeem any portion of that investment.

171.    Plaintiff Peter T. Lambrakis ("Lambrakis") is an individual who resides in New York, New York. Lambrakis purchased securities from and/or invested in DLIF in the amount of $700,000 on April 1, 2015, $300,000 on July 1, 2015, $950,000 on January 1, 2016 and $750,000 on March 1, 2017, and did not redeem any portion of that investment.

172.    Plaintiffs Rajesh Kannah Ramanujam and Priya Ravi (collectively, the "Ramanujam Plaintiffs") are individuals who reside in San Jose, California. The Ramanujam Plaintiffs purchased securities from and/or invested in DLIF in the amount of $150,000 on October 1, 2013, $100,000 on January 1, 2014, $100,000 on April 1, 2015, $200,000 on June 1, 2015, $500,000 on July 1, 2015, $75,000 on October 1, 2015, $125,000 on December 1, 2015, $200,000 on September 1, 2016, $50,000 on November 1, 2016, $100,000 on December 1, 2016, $100,000 on December 1, 2017, and $350,000 on May 1, 2018. They redeemed portions of that investment

in the amount of $300,000 on March 31, 2018, $100,000 on May 31, 2018, $150,000 on August 31, 2018, and $300,000 on October 31, 2018.

173.    Plaintiff Warrington Capital LLC ("Warrington") is a Florida limited liability company. Warrington purchased securities from DLIF in the amount of $2,217,457 on January 1, 2016, and did not redeem that investment.

174.    Plaintiff Jack Frank Aronov ("Aronov") is an individual who resides in Montgomery, Alabama. Aronov purchased securities from and/or invested in DLIF in the amount of $1,000,000 on March 1, 2015, and $2,000,000 on June 1, 2015, and did not redeem that investment.

175.    Plaintiff Etienne Boillot ("E. Boillot") is an individual who resides in Mamaroneck, New York. E. Boillot purchased securities from and/or invested in DLIF in the amount of $1,000,000 on June 1, 2016, and did not redeem that investment.

176.    Plaintiff Lisa D. Gagnum Boillot ("L. Boillot") is an individual who resides in Mamaroneck, New York. L. Boillot purchased securities from and/or invested in DLIF in the amount of $1,000,000 on November 1, 2018, and did not redeem that investment.

177.    Plaintiff Palamine Holdings, LLC ("Palamine") is a New York limited liability company. Palamine purchased securities from and/or invested in DLIF in the amount of $300,000 on October 1, 2014 and $150,000 on May 1, 2016, and did not redeem any portion of that investment.

178.    Plaintiff Christopher John Burke, a resident of Lake Forest, Illinois, is the trustee of the Matrix Capital Advisors LLC Employee Savings Plan ("Matrix Capital ESP"). The Matrix Capital ESP purchased securities from and/or invested in DLIF in the amount of $150,000 on February 1, 2015, and did not redeem that amount.

179.    Plaintiff John P. Roy Jr. ("Roy"), Margaret Rockwell ("Rockwell"), and Eleanor Robinson ("Robinson") are beneficiaries of the John P. Roy IRA account. John P. Roy, now deceased, purchased securities from and/or invested in DLIF in the amount of $100,000 on October 1, 2015, and did not redeem that amount. Roy resides in Louisville, Kentucky. Rockwell resides in Ankeny, Iowa. Robinson resides in Louisville, Kentucky.

180.    Plaintiff Theodore Strange ("Strange") is an individual who resides in Boynton Beach, Florida. Strange purchased securities from and/or invested in DLIF in the amount of $100,000 on October 1, 2015, and did not redeem that amount.

181.    Plaintiffs bring these claims as Limited Partners in the Fund, individually and on behalf of the Class. Plaintiffs and Class members were induced by Duff & Phelps's "independent" valuations of the Funds to invest in and continue to hold their investments in the Funds to the exclusion of other investment opportunities and relied on Duff & Phelps's purportedly independent "cross-checks" in making these decisions.

182.    In addition to out-of-pocket losses and lost profits from foregoing other investment opportunities, each plaintiff and Class member paid excess performance and management fees from 2016 through 2019 based on the overstated asset valuations that Duff & Phelps corroborated. Each plaintiff and Class member also sustained damages related to the payment of taxes on illusory income. Because the Funds are "pass through" entities with no independently taxable income, the profits and losses of the Funds are allocated to the Limited Partners in accordance with each Limited Partner's distributive share. Each individual Limited Partner pays taxes on the profits allocated to his or her capital account and may offset other taxable income with losses allocated to the capital accounts.

## **CLASS ACTION ALLEGATIONS**

183.    Plaintiffs bring this action as a class action pursuant to Rule 23 the Federal Rules of Civil Procedure on behalf of all persons and/or entities who were Limited Partners during the relevant period herein, and who were damaged thereby (the "Class").  Excluded from the Class are Defendant, the officers, directors and affiliates Defendant, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which or Defendant has or had a controlling interest.  Plaintiffs reserve the right to amend the Class and definitions if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

184.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by DLI and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in similar class actions.

185.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendant's wrongful conduct complained of herein.

186.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and litigation of this nature.

187.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Common questions include, but are not limited to, the following:

(a)     whether Defendant knowingly participated in the fraud and/or knowing or

reckless misrepresentations of Ross and certain others, thereby aiding and

abetting their fraud;

(b)     whether the Defendant negligently misrepresented the Funds' NAV;

(c)     whether Defendant aided and abetted Ross and certain others in making

negligent misrepresentations;

(d)     whether the Defendant aided and abetted Ross and certain others in

breaches of fiduciary duties; and

(e)     whether Plaintiffs and the Class have sustained damages as a result of

Defendant's conduct.

188.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the

wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## GENERAL ALLEGATIONS

### A.    DLI's Investment Structure

189.    Ross founded DLI in 2012 to invest in online lending marketplaces and to manage

several private funds.  Ross was the founder, 100% owner and CEO of DLI until he resigned on

March 18, 2019.

190.    In late 2016, DLI's fund structure was changed to a "master-feeder" structure,

where limited partner investors such as Plaintiffs made direct investments in distinct companies

called "feeder funds."  These feeder funds, in turn, made investments through a "master" fund.

191.     DLI was the registered investment advisor and general partner of DLI Capital, Inc., the "master" fund and vehicle through which two private investment "feeder" funds invested (the "Master Fund").  DLI also served as general partner and investment manager of the two "feeder" funds, Direct Lending Income Fund, L.P. ("DLIF") and Direct Lending Income Feeder Fund, Ltd. ("DLIFF") (collectively with the Master Fund, the "Funds").  Ross controlled each of the Funds.

192.     Under this structure, the Funds invested "all of their assets in a combination of loans to and equity in the Master Fund" which "generally issue[d] shares of common stock to the [Funds] in proportion to their investments in the Master Fund at the time of each investment by an investor in the [Funds]."  2018 DLI Private Placement Memorandum ("PPM") at 15.  The Master Fund in turn invested directly or indirectly in Collateral Assets, investments "in entities holding or originating short-term loans, lines of credit, receivables, real estate loans, portfolios of loans, intellectual property interests, real estate assets, consumer loans and other tangible and intangible assets, across a variety of industries." *Id.* at 2.

193.     Prior to the feeder fund structure, the Domestic Fund primarily bought small business whole loans with a purported objective to net an annualized 10% to 14% return for investors.  DLI explained in its October 2016 Investor Letter that, with the structure change, it moved away from purchasing whole loans to "setting up financing structures with lenders that pay a fixed return to the fund and for which a lender's individual loans serve as collateral assets."

194.     As of the 2018 PPM, the Partnerships' primary investment strategy was claimed to be as follows:

> to make Investments (through its investment in the Master Fund, described below) in entities holding or originating short-term loans, lines of credit, receivables, real estate loans, portfolios of loans, intellectual property interests, real estate assets, consumer loans and other tangible and intangible assets, across a variety of industries (such underlying assets, the "***Collateral Assets***"). Typical investments include, but are not limited to, $50-200 million asset-backed credit facilities to a

diverse group of specialty finance companies, special purpose vehicles and other counterparties (collectively the "**Counterparties**", and each a "**Counterparty**") across the small business, consumer, receivables, real estate and other sectors.

*Id.* (emphasis added).

195.    As General Partner and investment advisor to the Funds, DLI monitored "the risks of the individual Investments and Counterparties of the Master Fund's portfolio in aggregate." *Id.* at 6.  As stated in the PPM:

> The primary goal of this process with respect to individual Investments is ***to ensure that they are performing as expected, and are adhering in all material respects to their stated policies and procedures and the Investment documentation.*** In so doing the General Partner hopes to gain early insight into factors that might call for an increase or decrease in the allocation among such Investments. In this process, the General Partner relies on software tools and analytical procedures, consultants, legal counsel and third party servicers, industry research, and, among other things, information from and periodic interactions with the personnel of the relevant Counterparties. Additionally, third-party valuations of the Collateral Assets may be obtained or provided by the Counterparty or its affiliates in connection with the General Partner's review process.

*Id.* at 6-7; 2015 PPM at 10 (similar).

196.    DLI categorized the Funds' assets within a "fair value hierarchy" as Level 1, Level 2 or Level 3 assets depending on the data used to measure the fair value of the asset.

197.    Level 1 assets are those whose inputs can be verified through comparison to identical assets in the active market.  Level 1 assets include, for example, stocks and bonds that have a mark-to-market mechanism for determining their value.  Level 2 assets are those whose value can be approximated using models or extrapolation methods from known, observable price market values or other data.  Level 2 assets include, for example, corporate bonds and mortgage-backed securities.

198.    Level 3 assets are those whose value cannot be determined through analysis of observable inputs such as market prices or models.  Rather, the value of Level 3 assets must be

determined through the best available information and may require some measure of estimation or risk-adjusted valuation.

199.    The majority of the assets in which DLI invested were Level 3 assets, meaning they were illiquid and could not be valued through observable measures such as market prices.  The assets were supposed to be valued at fair market value.  As a result, independent third-party valuations of these assets were of paramount importance.  Indeed, without independent valuations, investors like Plaintiffs would be made to rely exclusively on DLI management's determination of the fair value of the Funds' assets.

200.    Independent valuation was particularly important because DLI charged investors both a management and performance fee based on the value of DLI's assets, giving management an incentive to inflate earnings to increase his own compensation.  DLI charged investors a monthly management fee based on 1% of the Master Fund's gross asset value, plus beginning of the month subscriptions minus redemptions.  The performance fee was charged to investors when the Master Fund's net asset value exceeded its prior high net asset value, and was calculated as 20% of these earnings before interest and taxes.  Thus, when DLI's portfolio was overvalued, investors were charged excessive fees, to the benefit of DLI.

201.    Unbeknownst to investors, Ross also held ownership stakes in a number of counterparties (i.e., borrowers), which were not made public or were concealed through stakes held by family members or family trusts.  Because of Ross' equity interests, DLI was not independent of these borrowers, and the transactions in which DLI invested were influenced by Ross' personal interests.

202.    At all relevant time periods, many of DLI's investment platforms were in financial distress, but those failing assets were hidden from DLI's investors.  DLI valued the positions

internally on a monthly basis.  Through this internal valuation process, DLI artificially inflated DLI's asset values, and in turn overvalued the funds.

203.    Duff & Phelps enabled this scheme by validating DLI's false valuations of those distressed platforms.

**B.    DLI Retains Duff & Phelps to Attract Investors**

204.    In 2016, DLI sought to attract large institutional investors into the Funds, which required an independent third-party valuation of DLI's assets.  Ross decided to hire an outside valuation firm.  Ross had been resistant to having a third party perform actual independent valuations, even though DLI's earlier auditor suggested it.  He described the process as "annoying" and stated that he would like to avoid it.

205.    According to the Receiver, Ross quickly identified Duff & Phelps as the "independent" valuation firm that suited DLI's needs.  As Duff & Phelps was aware, DLI only wanted valuations from Duff & Phelps to help bring more investor money into the Funds, and DLI wanted those valuations to hew closely to its own.  In an internal email, Ross stated "[i]deally the way this work [sic] is that Duff & Phelps will validate our own valuations . . . ."  DLI also made that intent clear to Duff & Phelps.  In an October 4, 2016 email, DLI directly told Duff & Phelps, "[o]ur intention is to value our investments at fair value *as reported on our balance sheet*." (emphasis added).

206.    Duff & Phelps is an international valuation firm that provides valuation services worldwide.  Duff & Phelps touts its expertise and claims to "differentiate ourselves in our commitment to question assumptions, be the independent eye, critically analyze facts and tell our clients what they need to know to make sound decisions."

207.    Duff & Phelps recognizes the importance of accurate independent valuations to investors.  On its website, Duff & Phelps explains that "[i]ndependent reviews of fair value policies, procedures and results ***provide comfort to investors***, fund administrators and accounting managers as well as auditors regarding the entity's valuation assessment." (emphasis added).

208.    In a March 16, 2016, publication on Duff & Phelps' website, it acknowledged that inaccurate valuations could harm investors and may constitute a breach of fiduciary duty by managers:

> The Importance of accurate valuation processes, particularly of hard-to-value assets, is critical.  ***Inaccurate valuations can result in financial losses being incurred by investors***, either via the subscription/redemption process for an open-ended fund vehicle or through secondary trades and misallocations of capital in a closed-ended vehicle.  A failure to adhere to the basic principles of fair value NAV (Net Asset Value) may also constitute a breach by the manager ***of its fiduciary duty to act in the best interests of investors***.

(emphasis added).

209.    On October 26, 2016, DLI retained Duff & Phelps to provide independent valuations of DLI's investments and to issue quarterly reports expressing opinions on the fair value of DLI's assets (the "Engagement Letter").  The final Engagement Letter incorporated language requested by DLI stating that Duff & Phelps would apply its judgment "***in consultation with Management***" in generating a range of fair value estimates and assessing the reasonableness of DLI's internal estimates.

210.    At the outset, Duff & Phelps knew that DLI intended to use its valuations to meet regulatory reporting requirements and acknowledged that its valuation services were "being provided in conjunction with [DLI's] preparation and timely completion of certain reporting requirements."  Duff & Phelps knew that its reports were being submitted to the SEC.

211.    Duff & Phelps also knew that DLI intended to use its valuations to attract additional funding from investors and to project institutional stability and confidence to existing investors.

Indeed, the Engagement Letter included a provision that permitted DLI to reference Duff & Phelps in response to investor inquiries, stating that "[m]anagement intends to use this analysis for the purpose of assisting in its investment disclosures."

212.    After retaining Duff & Phelps, DLI began capitalizing on its bolstered credibility, broadcasting to existing and potential investors that it hired a valuation firm to support its valuations.  DLI touted in its PPMs that it had an independent valuation firm in place, which gave comfort to Plaintiffs and prospective investors that the Funds were legitimate, financially sound investment funds that complied with regulatory requirements.  Upon information and belief, Duff & Phelps knew of that representation in the PPMs.

213.    Further, in its periodic investor letters DLI began directly identifying Duff & Phelps to investors as DLI's purportedly "independent" valuation firm.  Through its investor letters and investor portal, DLI provided the Funds' investors with information concerning its assets under management, the valuation of different positions within its portfolio and the performance of its different loan platforms.

214.    In DLI's February 2017 investor letter, DLI introduced Duff & Phelps:

Finally, to complement our comprehensive internal valuation approach, we have retained Duff & Phelps, a global leader in valuation consulting, to provide quarterly valuation ranges for the fund's assets.  Using their independently formulated valuation range at the portfolio level, we validate our own methodology.  **Beyond simply confirming that our own valuations fall within their given range, we openly discuss discrepancies and conclusions with their team.  Through this open dialogue on the analysis and inputs employed, we adapt our own process over time.**

(emphasis added).

215.    In its July 2017 investor letter, DLI reminded investors that "we continue to use third-party valuation firm Duff & Phelps to provide us with an independent asset level quarterly valuation range on our investment assets."

216.    Duff & Phelps initially provided valuation reports quarterly, then began providing monthly reports in October 2018.  In its October 2018 investor letter, DLI once again emphasized Duff & Phelps' involvement and noted that the valuations were relied upon by DLI's auditors:

> As you may know, the Funds work with Duff & Phelps and Lincoln International to provide an independent valuation of each of the Fund positions.  Duff is one of the preeminent firms in the third-party valuation space, with over 3,500 professionals in 28 countries.  Lincoln is also widely respected, having 500 employees across 20 countries.  The reporting we receive from Duff and Lincoln shows a valuation range for each Fund investment.  We use these third-party valuations to provide independent support for our internal valuation methodologies and conclusions.  These reports are also made available to the Funds' auditors, Deloitte.

217.    In November 2018, DLI shared its purported monthly return with its investors and directly linked it to Duff & Phelps' valuation: "We have received our third-party valuation reporting from Duff & Phelps and Lincoln Partners, and we are able to confirm our previous estimate of 0.75% for the month ending October 31, 2018 is the final performance return for that month."

218.    Similarly, the December 2018 Investor Letter stated: "We have received our third-party valuation reporting for November, and we are able to confirm that the previous estimate of 0.77% for the month ending November 30, 2018 is the final performance net return for that month."

219.    Duff & Phelps knew that it was disclosed in those Investor Letters as DLI's "independent" valuation firm.  Further, Duff & Phelps knew that limited partners such as Plaintiffs would rely on both the purportedly "independent" cross-check they were supposedly performing and the later valuations in making their investment decisions relating to the Funds.

220.    In reality, however, Duff & Phelps was anything but independent and instead assisted DLI's scheme.  Duff & Phelps failed to perform the procedures outlined in the

Engagement Letter and significantly overvalued DLI's investments to match DLI's own internal valuations, despite having contradictory information in its possession.

**C.    Duff & Phelps Overvalues DLI's Assets**

221.    DLI provided Duff & Phelps with detailed financial data regarding each of its investments on a regular basis.  Duff & Phelps never indicated that it lacked sufficient information required to perform an accurate valuation.  Yet Duff & Phelps still dramatically overvalued many of DLI's investments in an effort to support DLI's own overvaluations.

222.    According to the Receiver, "DLI's investments were generally poorly underwritten; inadequately documented, often without proper credit agreements and securities interests; and inconsistently administered."  *SEC* Action ECF No. 217 at 12.  "The Receiver's investigation has revealed the basis for the losses, including the discovery as to the nature of the DLI investments; the true likely value of the investment positions; the real returns on the investments to DLI; and the ***inaccurate reporting of investments results and the performance and financial position of counterparties***."  *Id.* at 3 (emphasis added).

223.    Duff & Phelps discovered these facts during its engagement but consciously disregarded them at the behest of Ross in order to continue reaping valuation fees.  Despite understanding the purpose of its independent valuations and the incentive for DLI to inflate its internal valuations, Duff & Phelps put aside its own professional judgment to accommodate DLI, and altered its methodology and conclusions to meet DLI's expectations.

224.    DLI's management valued the company's investments without adequate consideration of borrower defaults.  Duff & Phelps performed no loan-level analysis.  DLI forecasted cash flows at a single loss rate and modeled its valuations with a zero-loss assumption.  Duff & Phelps accepted these assumptions without regard for their reasonableness.

225.    And when Duff & Phelps' range of fair values did not comport with DLI's valuations, it worked internally to identify what could be done to bring its valuations into DLI's predetermined ranges before preparing a draft valuation report.  For example, on one occasion, Duff & Phelps deleted discount rate information as "not supportive/too low" in order to support DLI's desired valuations.

226.    In addition, Duff & Phelps circulated drafts of each of its valuation reports to DLI so that DLI could comment on the range of fair values and the methodology that Duff & Phelps used to calculate such ranges, as well as the actual language used in the reports to describe the platforms and their risks.

227.    DLI frequently pushed Duff & Phelps to change the valuations.  During the report preparation and revision process, DLI often called Duff & Phelps' attention to issues with its investments that it believed Duff & Phelps did not effectively address.

228.    Duff & Phelps often observed troublesome information about DLI's investments but declined to act upon those observations by appropriately lowering its valuation of the investments.  For example, Duff & Phelps observed one investment platform's "large number of defaulted loans."  In another, it observed that the accrued interest balances as a percentage of current balance were "peculiar."

229.    After receiving DLI's comments on the reports, Duff & Phelps would discuss whether DLI was happy, and whether there were valuations that DLI wanted changed.

230.    Duff & Phelps' handling of the valuations of DLI's key assets, analyzed below, further supports Plaintiffs' allegation that Duff & Phelps knew of DLI's scheme:

### 1.    *QuarterSpot Loan Portfolio*

231.    QuarterSpot, Inc. ("QuarterSpot") was an online small business lender.  In August 2013, DLI entered into an agreement with QuarterSpot to purchase unsecured, payment-dependent promissory notes from QuarterSpot.  DLI funded thousands of QuarterSpot loans and was entitled to the principal and interest payments made by the underlying borrowers.  Under this agreement, QuarterSpot would continue to service the loans in exchange for a service fee, which was a set percentage of the loan interest collected each month.

232.    As part of DLI's monthly reporting and closing process, QuarterSpot had to provide DLI with loan-level data, including performance and payment figures for each individual loan.

233.    QuarterSpot was not sustainable due to a high default rate on the underlying loans. To disguise QuarterSpot's defaults, Ross falsified payment figures to make it appear that payments had been made by borrowers when they had not been.  He directed QuarterSpot, as part of its monthly reporting to DLI, to "rebate" a portion of its servicing fees by making payments to DLI. This made it appear that borrowers were making principal payments on seriously delinquent loans.

234.    Under DLI's valuation policy, many of these non-performing loans should have been marked down 50% or 100% but instead were valued at par because of the false payments. This caused the QuarterSpot position to be overvalued and the Funds' net asset value to be inflated.

235.    Indeed, between spring 2014 and fall 2017, DLI overstated the valuation of its QuarterSpot position by a total of at least $53 million, and materially misrepresented its returns. DLI collected at least $5-6 million in extra management and performance fees from the Funds that it would not have otherwise collected.

236.    Duff & Phelps was aware of what was going on.  Duff & Phelps received a copy of the unfalsified QuarterSpot numbers and circulated a draft valuation report to DLI reporting $14.5

million in defaults — significantly more than the $1.7 million in defaults reported by DLI. DLI pushed back, maintaining that there had been errors in the underlying loan performance data and that QuarterSpot had astonishingly located additional loan payments that would be posted soon.

237.    Duff & Phelps adopted DLI's farfetched explanation and revised its valuation to match DLI's. Evidencing a priority to please DLI over conducting a legitimate valuation, Duff & Phelps' valuators remarked internally that DLI should "be pretty happy with that change."

238.    In mid-2017, DLI hired a new CFO who implemented a new valuation policy that discovered the issues with QuarterSpot's loan payments. The CFO advocated to Duff & Phelps and others that a $35 million reduction in the value of DLI's QuarterSpot position. But instead of devaluing QuarterSpot, DLI placed the QuarterSpot assets in a "side pocket" — a kind of accounting limbo that helped conceal to investors what was really going on.

239.    This was critical, as a lower valuation of QuarterSpot at that time would have raised concerns regarding that asset and all of DLI's other assets, which the Receiver said would have "led to an exodus of investors and a potential collapse of the structure."

240.    Duff & Phelps knew that, shortly after it endorsed DLI's incredible explanation about QuarterSpot's defaults, DLI was nonetheless sidepocketing the QuarterSpot assets. Yet Duff & Phelps continued servicing DLI's needs on DLI's terms. Duff & Phelps chose time and time again to abandon its independent judgment and did not appropriately account for the risk associated with the QuarterSpot platform.

### 2.    *Dealstruck and the SEC Investigation*

241.    During the course of its work for DLI, Duff & Phelps helped DLI respond to a lengthy SEC investigation into DLI's business. The investigation culminated in the issuance of an SEC deficiency letter in July 2018. During the course of the investigation, Duff & Phelps learned

of numerous deficiencies through the SEC's inquiries. One such inquiry involved misleading statements relating to one of the DLI assets that Duff & Phelps valued, Dealstruck Funding 3, LLC ("Dealstruck"). Another inquiry focused on the fact that Ross held an undisclosed personal interest in Dealstruck, which was one of DLI's largest investments. Indeed, the Receiver reports that Ross "caused DLI to take actions that increased DLI's position in poorly performing portfolios to protect his individual position, all the while causing DLI to fail to adjust its valuations or disclose the underling weaknesses in the collateral to DLI's investors." *SEC* Action ECF No. 217 at 14.

242.    Despite the SEC highlighting DLI's deceitful practices and conflict of interest during the investigation, Duff & Phelps never altered or amended its valuations of Dealstruck. Instead, it continued to help DLI navigate through the investigation.

### 3.    *VoIP Guardian Loan Portfolio*

243.    Since 2015, DLI provided a revolving loan facility to VoIP Guardian ("VoIP"). VoIP was engaged in telecom factoring, which involved financing short-term commercial receivables of small "Tier 3" telecom providers. Those providers purportedly had contracts with and receivables due from "Tier 1" telecom providers. VoIP was formed by Rodney Omanoff and the operating agreement makes clear that Ross had an ownership interest in VoIP.

244.    VoIP was DLI's largest asset position. DLI first invested in VoIP in 2015, providing $32.83 million as of December 31, 2015, to VoIP on a $50 million revolving loan facility. The loan facility increased over the next three years with balances at fiscal year-end for 2016 and 2017 of $99 million and $180 million, respectively. By February 2019, the principal loan balance was $191.3 million, which was approximately 25% of DLI's aggregate net asset value.

245.    The collapse of VoIP began in 2017.  A Tier 1 provider, BT Nederlands, suspected that a Tier 3 provider that was factoring its receivables with VoIP was faking calls and engaging in money laundering.  It therefore withheld a $20 million payment due to that Tier 3 provider. That left VoIP unable to repay that portion of DLI's loan.

246.    Despite the fact that DLI initially appraised the VoIP loans as being at a low risk of default due to the thought that Tier 1 providers would always pay, DLI and Duff & Phelps, which knew about the $20 million nonpayment, did not lower the valuation.  Making matters worse, and as Duff & Phelps knew, DLI kept lending money to VoIP.

247.    Rather than factor the $20 million BT Nederlands default in its valuation of VoiP, Duff & Phelps stuck with a "zero-loss assumption" and emphasized that the payments to DLI were "guaranteed by large Tier 1 telecommunications carriers."  Duff & Phelps did not name any of those supposed Tier 1 companies, identify any analysis of the amounts owed by each Tier 1 company or explain the basis for its conclusion that such companies were creditworthy.

248.    Not until September 2018 did Duff & Phelps disclose that VoIP had an unpaid $21 million receivable.  But even still, Duff & Phelps did not disclose that the unpaid receivable had been outstanding since early 2017, or why DLI had put the receivable on nonaccrual since March 2017.  Yet again, despite clear knowledge of significant losses in DLI's portfolio, Duff & Phelps continued to model VoIP as DLI wanted: with a "zero loss assumption."

249.    By the end of 2018, two purported Tier 1 providers — Indigo11 and iKarim — began slowing payments.  These providers eventually stopped making payments altogether, owing over $160 million.  VoIP ceased paying DLI in December 2018, and VoIP later filed for Chapter 7 bankruptcy.

250.    The Receiver estimates that, as of November 2018, the effective date of Duff &
Phelps' last valuation report, DLI and Duff & Phelps had overvalued DLI's investment in VoIP
*by $192.6 million*.

### 4.    *Global Innovation Aggregators, LLC and IPEL, Inc. ("Investment M")*

251.    In May 2017, DLI began loaning tens of millions of dollars to an entity seeking to
monetize a patent portfolio primarily through patent litigation ("Investment M").  "Investment M"
refers to Global Innovations Aggregators, LLC, and its parent company, IPEL, Inc.

252.    Investment M was a $100 million credit agreement collateralized by Investment
M's assets with an 80% loan-to-value ratio.  The credit agreement seemed standard: DLI would
lend money to Investment M in an amount collateralized by the patent portfolio, from which
Investment M could borrow up to 80% of their value.

253.    Investment M's patent portfolio had an original cost basis of $1.3 million.  Yet DLI
lent Investment M more than 10 times that amount — $15 million — to purchase the portfolio
from Investment M's owner, which immediately pocketed the windfall.

254.    Three months later, the credit agreement was amended to allow Investment M to
pay interest and other waterfall costs out of the interest reserve account.  This allowed Investment
M to satisfy the credit agreement's payment requirements even in the absence of any revenue.

255.    One year later, in August of 2018, the credit agreement was amended again.  DLI
permitted Investment M to increase its borrowings and capitalize its interest payments.  In other
words, to simply add the interest to the principal due rather than pay that interest.

256.    Duff & Phelps saw the credit agreements, noting them in its valuation reports.  It
knew that Investment M was overpaid from the start and in trouble.  But it never did anything to
disclose these facts or account for them in its valuation.  It did not account for significant impacts

the amendments would have on the investment and what such amendments revealed about Investment M's financial status. Duff & Phelps made no adjustments to its valuation of Investment M even though the second amendment meant that Investment M was literally borrowing from DLI to pay DLI. Duff & Phelps repeatedly stated only that Investment M "continues to perform and has maintained compliance since origination," even though it knew Investment M was earning no revenue and was capitalizing its interest payments.

257.    What's more, after DLI's initial investment M significantly changed its business model, moving its patent enforcement strategy almost entirely from the U.S. to China, where there was no historical data on litigation success. Investment M transferred the bulk of its patent portfolio to China for no consideration, a fact that Duff & Phelps neither disclosed nor factored into its valuations. Despite all the uncertainties created by the change in business model, Duff & Phelps continued to model the investment with a zero-loss assumption.

258.    DLI also did not assign value to the patents based upon traditional fair market value, but instead based value on a prediction of how much Investment M could receive in a legal settlement against an infringer which was in turn based on Investment M's historical performance with the assumption that the same performance would continue. Duff & Phelps accepted and did not question this valuation method, and even determined that Investment M was overcollateralized, reducing its discount rate by 1% and increasing its purported value. Duff & Phelps also accepted patent valuations from another firm that had acknowledged those valuations' superficiality and unreliability. The firm noted that it had "not analyzed the patents or the claim charts with any significant level of detail."

259.    In addition, Duff & Phelps used the same benchmarks for its fair value calculations as it used for another DLI investment, Biz2credit, an investment that in no way resembled Investment M being a business that provided online credit to small businesses.

260.    As of November 2018, Investment M was overvalued by approximately $52.1 million. Receiver Report at 67.

261.    According to the Receiver, Investment M "was inconsistent with the representations of DLI's investment strategy made to investors; overvalued by DLI; insufficiently underwritten; and the risks to investors were not adequately disclosed." *Id.* at 15-16.  Duff & Phelps knew this, and ignored the fact that DLI was simply loaning money to Investment M so that Investment M could stay current on its loan to DLI.

###### 5.    *LCUSA Funding, LLC and LendingUSA, LLC ("Investments H, I and O)*

262.    Investments H and I involved loans to a consumer finance company called Lending USA that specialized in point-of-sale financing.  DLI was to receive a 16% return on a preferred equity investment in a joint venture with Lending USA, called Consumer Loan JV 1, that would purchase consumer loans ("Investment I"), but the joint venture company never achieved 16% earnings.  "Investment O," which involved an affiliate of Lending USA, was supposed to pay the difference between the joint venture's actual profits and the promised 16% return to DLI.  Instead, Investment O lost money.  Nevertheless, DLI gave Investment O a corporate loan to cover its losses.  This loan to Investment O is referred to as "Investment H."  Investment O itself could not pay back DLI, and DLI kept loaning it more and more money.

263.    According to the Receiver's review of DLI's records, Duff & Phelps' work product for Investment H's valuations reflected "a total lack of care or competence."  In its September 2016 valuation, Duff & Phelps combined Investments H and I into a single investment without

disclosing the different risks and values associated with each, even though Investment I was a corporate loan to a parent entity and Investment H was an equity investment in a joint venture that purchased loans.

264.    Additionally, Duff & Phelps concluded that the joint venture would always pay the 16% guaranteed return, intentionally making no effort to independently analyze whether that assumption was correct (it was not).

265.    Duff & Phelps received financial documents showing Investment O's losses and negative loan performance, but never provided any separate valuation of Investment O.

266.    Duff & Phelps' valuation also assumed a stream of cash payments, consciously disregarding that DLI had agreed not to receive cash returns on the joint venture for several years and that the majority of interest owed on Investments H and I were capitalized rather than paid in cash.  These omissions led to Investments H and I being overvalued by approximately $141.8 million as of November 2018.

### 6.    *Strategic Acquisitions, Inc. ("Investment T/S")*

267.    Investment T/S, which refers to Strategic Acquisitions, Inc., was a Los Angeles based "fix and flip" real estate acquisition company and thus represented a significant departure from DLI's stated investment strategy.   Yet Investment T/S became one of DLI's largest investments.

268.    DLI began lending large sums of money to Investment T/S in 2015 pursuant to a credit facility ("Investment T").   In total, DLI loaned Investment T/S over $230 million. Investment T was purportedly secured by real estate and a $100 million personal guaranty, but DLI did little due diligence into Investment T's ability to pay.

269.    Payments from Investment T/S were in fact slow and its collateral deficient. Investment T/S capitalized its interest payments into loan principal and showed declining sales. It continued to borrow from DLI to buy new properties. Yet as with DLI's other investments, Duff & Phelps accepted DLI's valuations without question, ignoring Investment T/S's poor financial condition and blindly accepting that T/S's personal guarantor could cure any under collateralization.

270.    By April 2016, Investment T/S's balance sheet was worsening, showing a net loss of $13.2 million and an accrued interest receivable of $7.7 million. Yet Duff & Phelps' September 30, 2016 valuation report was bullish on Investment T/S, characterizing a potential loss as "highly unlikely." The report also stated that Investment T/S's personal guarantor had "substantial assets" guaranteeing the loans. In fact, the guarantor lacked liquid assets to cover the guaranty. *Id.*

271.    Investment T/S's financial condition continued to deteriorate over the next year, with Investment S's financial statements for 2017 showing a member deficit of $4.5 million, sales for the last six months of 2017 of $29.8 million, expenses of $34.1 million and a net loss of $4.3 million. Likewise, Investment S's cash flows from operating activities for the same period showed a loss of $4.3 million, net borrowing from revolving line of credit of $107.6 million, and a net increase in cash from financing activities by $2.7 million. Thus, it was readily apparent that Investment S's cash stemmed not from operations, but from financing.

272.    Yet Duff & Phelps consciously disregarded this information, claiming in essence that the relationship was too young to conclude that Investment T/S was in trouble. Its September 30, 2017 valuation report stated that it "considered the proximity of the funding date to the Valuation Date" and that as "only a few months have elapsed since the funding date, and

significant cash floor surveillance is not yet available, D&P has valued the [Investment S] Fund

Portfolio on a cost basis."

273.     Duff & Phelps purposely failed to dig in and prepare any true valuation of

Investment T/S over the entirety of its engagement.  It never substantiated the assets of the personal

guarantor and, while acknowledging that Investment T/S was undercollateralized, simply stated

without any apparent investigation into feasibility that the guarantor "is currently working in good

faith to resolve this situation with a solution that may include, among other things, adding

additional collateral, sale of properties, and/or monetization of other personal assets of the

guarantor."  Eventually in its November 2018 report Duff & Phelps omitted its recurring statement

that the guarantor had "substantial assets," but included no explanation as to why it did so.

274.     All the while, DLI continued to pour Plaintiffs' money into Investment T/S.  As of

November 2018, Investment T/S was overvalued by $48.2 million.

**D.     Duff & Phelps Had Actual Knowledge of DLI's Fraud
        and Breaches of Fiduciary Duty**

275.     As shown in detail above, Duff & Phelps had actual knowledge of DLI's fraud,

DLI's fiduciary duties to Plaintiffs and DLI's breach of those fiduciary duties.  Duff & Phelps

knew that:

    a.  QuarterSpot's true defaults were multiples higher than reported by DLI, and that despite DLI's assurances of QuarterSpot's valuation, DLI still placed those assets into a side pocket;

    b.  The SEC was investigating misleading statements made by DLI regarding Dealstruck, and investigating Ross' conflicted financial interest in Dealstruck;

    c.  DLI's valuation of its largest asset VoIP, failed to disclose underlying receivables fraud and a $20 million payment shortfall that rendered the valuation's "zero loss assumption" demonstrably false;

    d.  DLI loaned to Investment M an amount more than 10 times its collateral value, then when Investment M failed to repay the loan, DLI allowed Investment M to

capitalize interest payments to avoid a default that would have impacted its valuation;

e. DLI speculated Investment M's value by "predicting" how much Investment M could receive in legal settlements against patent infringers, despite the fact that Investment M had transferred the bulk of its patent portfolio to China for no consideration;

f. DLI was covering up losses in its joint venture with Lending USA by lending more and more money to an affiliate that used that money to make Lending USA's payments, without ever paying it back; and

g. DLI valued Investment T/S at a level that greatly overstated its deteriorating financial condition and the inability of its personal guarantor to cover.

E.    **Duff & Phelps Substantially Assisted the Fraud and Fiduciary Breaches**

276.    As also shown in greater detail above, Duff & Phelps substantially assisted DLI's

fraud and breaches of fiduciary duty by:

a. In an effort to arrive at valuations that comported with DLI's valuations, deviating from its normal practices, procedures and valuation methodologies in violation of industry standards;

b. Ignoring data in its possession that contradicted conclusions reached in its valuation reports;

c. Lending its name and credibility to DLI and Ross;

d. Providing DLI with draft valuation reports and then incorporating DLI's changes into the reports, despite the fact that those changes painted an inaccurate picture of DLI's status;

e. Failing to alter its valuations of QuarterSpot despite having accurate data of QuarterSpot's defaults and knowing that DLI put those assets in a side pocket;

f. Continuing to help DLI navigate the SEC's investigation and failing to alter its valuations of Dealstruck despite the SEC's focus on misleading statements that DLI made relating to Dealstruck, and on Ross' conflicted financial interest in Dealstruck;

g. Adopting DLI's zero-loss assumption of VoIP despite knowledge that a $20 million unpaid receivable rendered that assumption, and DLI's valuation of VoIP, demonstrably false;

h. Adopting DLI's valuation of Investment M despite Investment M's inability to repay its loan; the change in Investment M's business model; the transfer of

Investment M's patent portfolio to China for no consideration; DLI's "predictions" of what recoveries Investment M's portfolio might receive; and despite the fact that the valuation came from a previous valuation firm that acknowledged it had not analyzed Investment M's patents or claims "in any significant level of detail."

i.  Combining Investment H and Investment I into a single investment, which obfuscated Investment H's role as a vehicle to cover up the failure of Investment I; and

j.  Adopting DLI's valuation of Investment T/S despite Investment T/S's obvious financial woes, its capitalization of interest payments and its personal guarantor's inability to cover any losses, misleadingly claiming that DLI's relationship with Investment T/S was essentially too recent to analyze.

**F.   At the Very Least, Duff & Phelps Made Negligent Misrepresentations and Omissions**

277.   At the very least, Duff & Phelps' valuation reports contained untrue statements that it should have known were false.  For example, Duff & Phelps stated:

a.  That up to 40% of the loan portfolio constituting the Funds' assets was worthless and payments to investors were made using funds from new investors in a Ponzi-like fashion;

b.  That the majority of the collateral securing the loans constituting the Funds' assets was uncertain and speculative and thus any return was unreliable and unlikely to continue;

c.  That Duff & Phelps had verified the structure and logic of each DLI valuation model and analyzed all assumptions to ensure that they provided an adequate representation of risks;

d.  That it had analyzed all assumptions in light of actual and potential risks and assessed the relevance of each change in assumptions;

e.  That it had analyzed all assumptions in light of actual performance of the collateral;

f.  That it had developed an appropriate valuation approach based on each Investment's characteristics and structure;

g.  That the Funds' investment in QuarterSpot, which representing 15% of all the Funds' assets as of December 31, 2017, was significantly overvalued;

h.  That VoIP's valuation deserved a zero loss assumption despite the $20 million BT Netherland default;

    i.    That Investment M "continues to perform and has maintained compliance since origination," even though it knew Investment M was earning no revenue and was capitalizing its interest payments;

    j.    That Investment M was overcollateralized;

    k.    That Investment H and Investment I were the same investment;

    l.    That Investment I would always pay the 16% guaranteed return to DLI;

    m.    That Investment T/S's default was "highly unlikely";

    n.    That Investment T/S's personal guarantor had "substantial assets" guaranteeing the loan; and

    o.    That the relationship between DLI and Investment T/S was too young to verify that Investment T/S was in trouble.

278.    Duff & Phelps also failed to disclose material information that should have been included in its valuation reports.  For example, Duff & Phelps failed to consider in its valuations, or to otherwise disclose :

    a.    The QuarterSpot default level;

    b.    The QuarterSpot side pocket;

    c.    The SEC investigation and deficiency letter;

    d.    Ross' personal interest in Dealstruck;

    e.    That VoIP was a start-up run by Omanoff, who had operated a fraudulent company, Bolotel, which was purportedly in the same business as VoIP; and 80% of VoIP's receivables were owned by just two foreign companies;

    f.    Investment M's sale of its patent portfolio to China for no consideration; and

    g.    Why its November 2018 valuation report removed a statement that Investment T/S's personal guarantor had "substantial assets."

279.    Duff & Phelps' valuation reports substantially corroborated DLI's false valuations of Fund assets over a period of years.  Duff & Phelps failed to identify, discuss, disclose, analyze or account for material risks to DLI's investments even though Duff & Phelps was aware of those risks.

280.    Duff & Phelps knew that the results of its valuations would be relied upon by DLI's auditors and investors.  Duff & Phelps knew that DLI touted Duff & Phelps' "independent" valuations to investors in both the PPMs and Investor Letters, inducing investment in the Funds and continued investment holdings in the Funds.

281.    Had Plaintiffs known of the intentional acts described herein and/or the true value and issues plaguing DLI's investments that Duff & Phelps failed to discover through inadequate valuations and/or discovered and failed to disclose, Plaintiffs would not have initiated their investments in the Funds and/or would have withdrawn their entire investments in the Funds.

282.    Plaintiffs were unaware of, nor could they have discovered through the exercise of reasonable diligence, the materially false and misleading representations and omissions regarding DLI's valuations because of the Funds' investments in hard-to-value, illiquid Level 3 assets.

## G.    DLI Collapses

283.    On February 11, 2019, DLI informed investors that DLIF and DLIFF had suspended withdrawals and redemptions effective February 8, 2019, due to the delinquency of the VoIP obligor payments on a $192 million loan.  For the first time, DLI informed investors that the Dutch government had been investigating VoIP since 2017, that the cessation of payments was likely a result of undetermined misconduct and that a substantial portion of the outstanding $160 million loan balance might not be recoverable.

284.    On March 19, 2019, DLI informed investors that QuarterSpot may have been materially overstated for years.  DLI further disclosed that Ross had formally resigned all of his positions with DLI the day before.

285.    On March 22, 2019, the SEC filed the SEC Action against DLI alleging that DLI had engaged in a multiyear fraud that resulted in approximately $11 million in overcharges of

management and performance fees to fund investors, and the inflation of DLI's private funds' returns.

286.    On April 1, 2019, the Receiver was appointed to oversee the DLI Funds.  The Funds are now being liquidated and the Receiver reports that upward of 70% of the capital invested has been lost.  The Receiver reports that Duff & Phelps' valuation reports were based on improper and inadequate valuation techniques, were misleading and materially overstated the value of the funds' assets.  According to the Receiver's estimate, DLI's net asset value as of November 2018 was overstated by at least $459.4 million, with Duff & Phelps' valuation support.  On November 13, 2020, the Receiver issued a detailed report regarding his investigation (the "Receiver's Report").  The Receiver stated, among other things, that: (i) investors will suffer cash losses total $250.7 million as of March 31, 2019 based on the shortfall between the amount of net invested capital and the estimated future distributions to investors; (ii) there was an aggregate underreported allowance for doubtful accounts and bad debt expense of $501.4 million relative to the obligations of loan counterparties as of March 31, 2019; (iii) of the $1.7 billion in funding for loans to counterparties, only $465.2 million has been repaid in full, with interest, as of July 31, 2020; (iv) that as of November 2019, the Funds' net asset value ("NAV") was materially overstated by $465.7 million; (v) the accounting records and account statements delivered to investors did not reflect appropriate reserves for uncollectable assets and included inflated "mark-ups" relative to appropriate asset valuations, both of which resulted in a misrepresentation of income, value of assets and net worth as well as overstated NAVs; and, (vi) the Funds were in essence a Ponzi scheme perpetrated by Ross and several others.  *SEC* Action ECF No. 320.

287.     The Receiver liquidated the investments in QuarterSpot and VoIP Guardian, as well as numerous other DLI assets at a fraction of their reported value, demonstrating that the fraud was not limited to overvaluing DLI's positions in QuarterSpot and VoIP Guardian.

288.     Plaintiffs are individuals, trusts, limited liability companies and corporations, each of whom invested, made additional investments and/or held their investments in DLIF and/or DLIFF in reliance on Duff & Phelps' purportedly independent valuation work.  Duff & Phelps' independent third-party valuations were critical, both intrinsically and actually, to each Plaintiff's decision to make their initial investment in DLI, hold that investment and make additional investments because the Funds invested in Level 3 assets that required an accurate valuation.  Each Plaintiff, themselves or through their RIA, reviewed and relied upon the investor reports containing the valuations that Duff & Phelps knew would be shared with investors.  Plaintiffs would not have invested, made additional investments or maintained their investments but for Duff & Phelps' actions and omissions.  Nor would Plaintiffs have paid excess management fees to DLI.  Duff & Phelps' valuations essentially supported DLI over the course of three years.  Without them, DLI would not have achieved the size and scale it would have achieved.  It would have collapsed.

289.     Plaintiffs have been damaged in the out-of-pocket loss of their investments, deprivation of access to their investment capital, the out-of-pocket loss stemming from the payment of taxes on phantom income and payment of management and performance not properly owed to DLI.

290.     All conditions precedent to this action have occurred or have been waived.

## FIRST CAUSE OF ACTION
### (Aiding and Abetting Fraud)

291.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 290 as if fully set forth herein.

292.    As set forth more fully above, DLI and Ross perpetrated a fraud on investors by overstating valuations, charging false management and performance fees, failing to disclose related- party transactions and the misusing investor funds.  Specifically, DLI and Ross knowingly engaged in a scheme to defraud Plaintiffs and Class Members by:

    a.  Making misrepresentations about DLI's assets, net income and investment returns and valuations;

    b.  Concealing DLI and its investment platforms' dire financial condition; and

    c.  Overstating valuations to calculate and extract inflated management and performance fees from investors.

293.    As DLI's independent valuation firm, Duff & Phelps was responsible for conducting and applying reasonable valuation procedures to substantiate DLI's conclusions regarding the value of DLI's assets, including utilizing methods and techniques that were appropriate under the circumstances.

294.    As catalogued in the paragraphs above, Duff & Phelps had actual knowledge of the fraud.

295.    Moreover, Duff & Phelps was given access to a large quantity of nonpublic documents and confidential material for consideration as part of its valuation work.  The overvaluations could not reasonably have escaped Duff & Phelps' attention in the course of its work.  The overvaluations were so extensive and so extreme that Duff & Phelps had knowledge of the misrepresentations, and made these and similar misrepresentations itself in its own valuation reports instead of alerting investors to the problems.

296.    Duff & Phelps knew, given its special role as independent valuator, that investors and potential investors, and specifically Plaintiffs and Class members, relied upon its independent valuations, particularly because the Funds invested in hard-to-value, illiquid Level 3 assets.

297.    As catalogued above, Duff & Phelps knowingly and substantially assisted DLI and Ross in unlawfully defrauding Plaintiffs and Class members.

298.    Duff & Phelps issued valuation reports that corroborated DLI's false internal valuations.  Duff & Phelps knew that, by verifying DLI and Ross' material misrepresentations concerning the value of DLI assets and bolstering DLI's credibility with investors, its valuations would induce Plaintiffs and Class members to invest, remain invested or make further investments in the Funds.

299.    By adopting DLI's improper valuations, Duff & Phelps helped conceal DLI's fraud. Duff & Phelps also provided substantial assistance by failing to act to challenge DLI's improper valuations, a failure to act that helped the fraud to proceed.

300.    In connection with providing substantial and material assistance to DLI and Ross, Duff & Phelps was aware of its role in the DLI/Ross fraud and acted knowingly in assisting DLI and Ross.

301.    Duff & Phelps substantially benefited from its participation in the DLI/Ross scheme.  The scheme caused Duff & Phelps to earn income from fees.

302.    Plaintiffs and Class members justifiably relied upon the materially misleading valuations prepared by Duff & Phelps, without knowing they were false, in deciding whether to invest, hold their investments or make additional investments in the Funds.  They also relied on the accuracy of those valuations in making excessive management and performance fee payments.

303.    As a direct and proximate result of Duff & Phelps' aiding and abetting of fraud, Plaintiffs and Class members have been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty)

304.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 290 as if fully set forth herein.

305.    At all relevant times, DLI was the general partner of DLIF and DLIFF.  As general partner, DLI owed fiduciary duties to limited partners, including Plaintiffs.

306.    At all relevant times, Ross was the CEO of DLI.  At all relevant times, Ross maintained considerable control over DLI and had substantial discretion and control over the Funds' investments and assets, Plaintiffs' and Class members investments and the Funds' communications to Plaintiffs and Class members.

307.    Ross and DLI's discretion and control gave rise to fiduciary duties to Plaintiffs and Class members as DLI and Ross occupied a superior position over Plaintiffs and Class members with respect to their management and control over their investments in the Funds, and had superior access to confidential information about DLI's investments and assets.  DLI and Ross' superior position necessitated that Plaintiffs and Class members repose their trust and confidence in the DLI and Ross, and Plaintiffs and Class members did so by investing in the Funds and replying on DLI and Ross' purported expertise and skill.

308.    By reason of their controlling positions, actions and direct and indirect representations to Plaintiffs and Class members, and by reason of the investors having deposited funds into Ross' control with the understanding that he would act in accordance with their promises in regard to the use of such funds, DLI and Ross owed investors fiduciary duties of loyalty and care and to deal honestly and in good faith.

309.    DLI and Ross breached their fiduciary duties to Plaintiffs and Class members by, among other things, permitting them to be given fraudulent information concerning the financial condition of DLI.

310.    Based on its knowledge of DLI's business model and lending activity, Duff & Phelps knew that DLI and Ross owed fiduciary duties to investors, including Plaintiffs and Class members.  Duff & Phelps also knew that Ross and DLI had discretion and control giving rise to a fiduciary duty and duty of care to Plaintiffs and Class members.

311.    Duff & Phelps had access to the loan/investment documents in performing its duties and knew that the Funds' investments were overvalued.

312.    As demonstrated by the facts stated herein, Duff & Phelps knowingly provided substantially assistance to DLI and Ross' breaches of fiduciary duty with knowledge that they were breaching those duties by issuing false valuation reports that it knew would be used to mislead investors and failing to conduct proper independent valuations of the Funds.  Those breaches of fiduciary duty were enabled by and would not have been possible but for Duff & Phelps' actions and inaction.

313.    As a direct and proximate result of Duff & Phelps' aiding and abetting of breach of fiduciary duty, Plaintiffs and Class members have been damaged in an amount to be determined at trial.

### **THIRD CAUSE OF ACTION**
**(Negligent Misrepresentation)**

314.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 290 as if fully set forth herein.

315.    Duff & Phelps had a duty, as a result of a special relationship — the valuation of DLI's assets — to give accurate information.  Duff & Phelps owed a duty to exercise reasonable

care to investors and potential investors, including Plaintiffs and Class members, to perform accurate independent valuations.

316.    Duff & Phelps owed these duties directly to Plaintiffs and Class members separate and apart from the contractual duties it owed to DLI.  Duff & Phelps assumed the duty to prepare valuation reports that directly affected the financial statements for the benefit of the limited partners, including Plaintiffs and Class members.  Duff & Phelps knew and acknowledged that Plaintiffs and Class members would rely on the results of its valuations and DLI's financial statements in making individual investment decisions.

317.    Duff & Phelps was negligent in their failure to exercise reasonable care. Defendant's conduct was an extreme departure from the ordinary standard of care and more than ordinary inadvertence or inattention.

318.    As catalogued above, Duff & Phelps made multiple false and misleading representations and omissions of material fact regarding the Funds' NAV without reasonable grounds for believing them to be true.  Duff & Phelps made materially false and misleading representations, and omitted material information within its knowledge, concerning the value of the Funds' assets and the credibility of the valuations assigned by DLI.  Duff & Phelps failed to conduct proper independent valuations of the Funds, instead issuing valuation reports that simply corroborated DLIF's and DLI Capital's false and inflated financial statements, which Duff & Phelps knew would be used to mislead Plaintiffs and Class members.

319.    In reality, Duff & Phelps made material mistakes and incorrect statements in the valuations, made gross errors in methodology and conclusion of value as to numerous DLI investments that resulted in massive overstatement of the value of DLI's investments, and failed

to identify, discuss, disclose, analyze or account for material risks to DLI's investments even when Duff & Phelps was aware of those risks.

320.    Duff & Phelps was given access to a large quantity of non-public documents and confidential material for consideration as part of its valuation work that would have alerted Duff & Phelps that the information it was receiving from DLI and including in its valuation reports was false and unsupported.

321.    Duff & Phelps knew that its false and misleading valuation statements were being sent to Plaintiffs and Class members.  Duff & Phelps knew and acknowledged that Plaintiffs and Class members would rely on the results of its valuations and DLI's financial statements in making individual investment decisions.

322.    Duff & Phelps knew that, given its special role as independent valuator, investors and potential investors, and specifically Plaintiffs and Class members, relied upon its independent valuations, particularly because the Funds invested in hard-to-value, illiquid Level 3 assets.

323.    Plaintiffs and Class members were the specific class of persons who relied upon Duff & Phelps valuations and who Duff & Phelps knew and intended would rely upon that work. Specifically, Duff & Phelps expected and intended that Plaintiffs and Class members would rely on Duff & Phelps' validation of DLI's valuations and financial statements in deciding whether to invest, hold their investments or make additional investments in the Funds.

324.    Plaintiffs and Class members justifiably relied upon the materially misleading valuations prepared by Duff & Phelps, without knowing they were false, in deciding whether to invest, hold their investments or make additional investments in the Funds.  They also relied on the accuracy of those valuations in making excessive management and performance fee payments.

Plaintiffs' and Class members' reliance on Duff & Phelps false and misleading representations was a substantial factor in causing their harm.

325.    As a direct and proximate result of Duff & Phelps' negligent misrepresentations, Plaintiffs and Class members have been damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Aiding and Abetting Negligent Misrepresentation)

326.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 290 as if fully set forth herein.

327.    Duff & Phelps aided and abetted in the negligent misrepresentations made by Ross and certain others.

328.    As alleged herein, Duff & Phelps performed valuations on Funds' investments and would have had access to the investment documentation showing representations to be false in making those valuations.

329.    As a result, Duff & Phelps knew that the loan portfolio was grossly over-valued.

330.    Duff & Phelps knew that false statements were being sent to Plaintiffs and Class members and that Plaintiffs and Class members would rely on the false statements.

331.    Accordingly, Duff & Phelps is liable to Plaintiffs and Class members for damages resulting from Ross's and certain others' negligent misrepresentations

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

1.    Declaring this action to be a class action and certifying one or more Plaintiffs as representatives of the Class and their counsel as Class Counsel;

2.       Awarding all forms of recovery allowed under law and equity, including rescission, restitution, disgorgement, injunctive and other equitable relief, compensatory, and punitive damages, in favor of Plaintiffs and the other members of the Class;

3.       Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, experts' fees, and costs;

4.       Awarding pre-judgment and post-judgment interest; and

5.       Granting such other and further relief as the court may deem proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: April 20, 2022

Respectfully submitted,

**BRAGAR EAGEL & SQUIRE, P.C.**
By: /s/ *Lawrence P. Eagel*
Lawrence P. Eagel
Marion C. Passmore
810 Seventh Avenue, Suite 620
New York, NY 10019
Telephone: (212) 308-5888

**THE MEADE FIRM p.c.**
Tyler Meade
*tyler@meadefirm.com*
Seena Forouzan
*seena@meadefirm.com*
California Office:
    12 Funston Ave., Suite A
    San Francisco, CA  94129
New York Office:
    111 Broadway, Suite 2002
    New York, NY 10006
Telephone: (415) 724-9600

Additional Counsel for Plaintiffs on next page (With Pro Hac Vice Applications Forthcoming):

**REISER LAW, p.c.**
1475 N. Broadway, Suite 300
Walnut Creek, California 94596
Telephone: (925) 256-0400
Facsimile: (415) 510-2544
Michael J. Reiser (133621)
    *michael@reiserlaw.com*
Matthew Reiser (315301)
    *matthew@reiserlaw.com*
Isabella Martinez (315299)
    *isabella@reiserlaw.com*

**LEVINE KELLOGG LEHMAN SCHNEIDER &
GROSSMAN LLP**
Jeffrey C. Schneider, Esq.
    *jcs@lklsg.com*
Jason Kellogg, Esq.
    *jk@lklsg.com*
Victoria J. Wilson, Esq.
    vjw@lklsg.com
Gabriel A. Lievano, Esq.
    *gl@lklsg.com*
201 South Biscayne Boulevard
22nd Floor, Miami Center
Miami, Florida 33131
Telephone: (305) 403-8788
Facsimile: (305) 403-8789